729 S.E.2d 270

**In re E.B., A Minor.**

**Michael J. Lewis, Secretary, West Virginia Department of Health and Human Resources, Petitioner.**

**No. 101537.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 20, 2011.

Decided June 21, 2012.

Darrell V. McGraw, Jr., Esq., Attorney General, Mary McQuain, Esq., Assistant Attorney General, DHHR Division/Bureau for Medical Services, Charleston, WV, for Petitioner.

Kevin M. Pearl, Esq., Michael G. Simon, Esq., Frankovitch, Anetakis, Colantonio & Simon, Weirton, WV, Louis Bograd, Esq., Washington, DC and Max Freeman, Esq., Lawrence Lassiter, Esq., Miller Weisbrod, LLP, Dallas, TX, Pro Hac Vice, for Respondent.

David J. Sims, Esq., Sims Law Offices, Wheeling, WV, Guardian ad litem.

BENJAMIN, Justice:

The instant action is before this Court upon the appeal of Michael Lewis, Secretary, West Virginia Department of Health and Human Resources, (hereinafter "DHHR"),[1] intervenor below, from a final order entered on July 12, 2010, in an infant summary proceeding under W. Va.Code § 44–10–14 (2002). In its order, the circuit court granted the motion of Respondent, Holly G.,[2] for allocation of a $3,600,000 settlement, holding that the United States Supreme Court case, *Arkansas Department of Health and Human Services v. Ahlborn*, 547 U.S. 268, 126 S.Ct. 1752, 164 L.Ed.2d 459 (2006), is the controlling law for the issues raised by the parties herein. The circuit court held that *Ahlborn* requires a proportional reduction of DHHR's recovery based on the ratio of the settlement to the "full value" of the case among the various damages categories. Using this method of allocation, the circuit court reduced DHHR's statutory reimbursement from the requested amount of $289,075.44, to $79,040.82, and directed that the net settle-

---

**1.** At the time the instant appeal was filed, Patsy Hardy served as Secretary of DHHR. However, Michael Lewis currently serves as Secretary of DHHR replacing former Secretary Hardy. Accordingly, Mr. Lewis has been substituted as the named Secretary in the instant appeal. *See* W. Va. Rev. R.App. P. 41(c) (providing for substitution of public officers as parties to appeals pending in Supreme Court of Appeals of West Virginia).

**2.** Holly G. is the biological mother of E.B., the minor in this appeal.

ment proceeds be placed in a special needs trust[3] for the benefit of the minor.

Herein, DHHR seeks a reversal of the circuit court's order and a remand with directions that DHHR is entitled to reimbursement in the amount of $289,075.44, plus interest. This Court has before it the petition for appeal, all matters of record, and the briefs and arguments of counsel. For the reasons expressed below, the July 12, 2010, order of the Circuit Court of Hancock County is affirmed in part, reversed in part, and remanded with directions.

## I.

### FACTUAL AND PROCEDURAL HISTORY

Holly G. gave birth to her son, E.B., at Coshocton County Memorial Hospital on May 12, 2005, in Coshocton, Ohio.[4] E.B. was born with severe brain damage, which has required and will continue to require significant medical care. Holly G., on behalf of E.B., applied for and received Medicaid benefits from the Ohio Department of Job and Family Services ("ODJFS") until February, 2007, when she and E.B. moved to Hancock County, West Virginia. On February 5, 2007, Holly G., on behalf of E.B., applied for and received Medicaid benefits from the West Virginia DHHR.

On or about May 16, 2007, Holly G. filed a medical malpractice lawsuit on behalf of the infant, E.B., in the United States District Court for the Southern District of Ohio, Eastern Division, against Coshocton County Memorial Hospital; Janet Burrell, R.N.; Gabriel Yandam, M.D.; and LeFemme Obstetrics and Gynecology, LLC. Holly G. settled the case against Dr. Yandam and LaFemme Gynecology, LLC in September 2009 for $1,000,000. The settlement constituted the policy limits of the defendants' insurance coverage and was contingent upon court approval. The settlement agreement did not allocate the amount recovered among the various elements of damages suffered, i.e., medical expenses, pain and suffering, lost wages, etc. DHHR sought reimbursement for its medical payments from the settlement proceeds Holly G. had obtained on E.B.'s behalf.[5]

On October 13, 2009, Holly G. petitioned the Circuit Court of Hancock County, West Virginia, pursuant to W. Va.Code § 44-10-14, for approval of the first settlement with Dr. Yandam and LaFemme Gynecology, LLC.[6] In her Petition, she requested that the Court pay her attorneys fees and legal expenses from the settlement funds, that Medicaid not be reimbursed due to the enormous costs of future care that she alleged dwarfed the limited funds available for settlement, that Holly G. be paid a fair sum of the net settlement proceeds, and that the remaining net settlement proceeds be placed in a special needs trust for the benefit of E.B. DHHR filed a motion to intervene on October 26, 2009.[7] In its motion, DHHR asserted

3. A section in the Medicaid Act, 42 U.S.C. § 1396p(d)(4)(A), provides that disabled persons under the age of sixty-five remain eligible for ongoing Medicaid assistance in spite of funds or other property held in a special needs trust, and can use special needs trust funds as a supplement to enhance the quality of their lives. The disabled person remains eligible for Medicaid assistance so long as the special needs trust contains a pay-back trust provision that specifies that the total Medicaid assistance provided will be paid back to the State after the beneficiaries' death from any funds remaining in the trust.

4. The Court's customary practice is to refer to minors by their initials rather than by their full names. *See, e.g., In re N.A.*, 227 W.Va. 458, 711 S.E.2d 280 (2011).

5. Pursuant to the request of Holly G.'s counsel for "Medicaid lien information," DHHR's Tort Recovery Unit sent her lawyers a compact disc showing claims paid by Medicaid on behalf of E.B. A "Notice of Assignment of Rights" and "Lien Letter" were then sent to Holly G.'s counsel on September 10, 2009.

6. Following the filing of Holly G.'s petition, the circuit court entered an order on October 22, 2009, appointing attorney David Sims as guardian *ad litem* for E.B.

7. The ODJFS also filed a motion to intervene on November 16, 2009. It asserted a Medicaid subrogation claim of $698,225.24 which it agreed to reduce to $377,041.63 for its pro rata share of attorneys fees and costs, notwithstanding that the Ohio subrogation statute does not include a provision for reduction of attorneys fees and costs. ODJFS did not object to the jurisdiction of the circuit court to hear and decide the petition for approval of settlement.

a statutory priority right to subrogation from the settlement proceeds. It also asserted that it did not agree to set aside its reimbursement, did not agree to a judicial allocation or apportionment, and further asserted that a Medicaid recipient's settlement funds first must satisfy the State's reimbursement for past medical expenses paid on behalf of the Medicaid recipient as a result of the third party's tortious conduct before the remainder may be transferred to a special needs trust.

On November 12, 2009, the circuit court held a hearing after which it granted DHHR's motion to intervene; approved the first settlement; approved payment of attorneys fees and litigation costs out of the settlement proceeds; ordered that the net settlement proceeds ($368,000) be paid into an escrow bearing account in the name of E.B. until further order of the Court; and directed Holly G., DHHR, and ODJFS to engage in good faith negotiations to attempt to resolve the disputes between them.

On December 9, 2009, Holly G. settled with the hospital and Janet Burrell, R.N. for $2,600,000. As with the settlement with Dr. Yandam and LaFemme Gynecology, this settlement constituted the policy limits of the defendants' insurance coverage and was contingent upon court approval. This settlement agreement also did not allocate the amount recovered among the various elements of damages. As of this date, DHHR had paid medical expenses for E.B. in the amount of $557,104.71. In accordance with W. Va.Code § 9–5–11 (2009)[8], DHHR offered to reduce the amount of medical payments it was owed by forty percent ($222,841.88), to reflect its pro rata share of attorney's fees incurred by Holly G. in her medical malpractice case. DHHR also offered to deduct an additional amount ($45,187.39) as its proportionate share of Holly G.'s legal costs in obtaining the settlements. This reduced DHHR's requested reimbursement to $289,075.44. Holly G. did not agree to DHHR's proposed reimbursement amount.

After a hearing held on December 21, 2009, the circuit court approved this second settlement, approved the payment of attorneys fees and additional litigation costs from the settlement proceeds, allocated $50,000 to Holly G. and $15,000 to A.B.,[9] ordered that the contested amount of the Medicaid reimbursements be placed in an escrow account pending further order of the court, directed that the net settlement proceeds be placed in a special needs trust for the benefit of E.B., and set a briefing schedule on the Medicaid subrogation issues. Pursuant to the circuit court's order, each of the parties filed their respective briefs.[10]

In "Petitioner's Brief on Allocation of Damages Pursuant to *Ahlborn*" filed before the circuit court, Holly G. argued that *Ahlborn* applies in the instant case. Holly G. argued that the "true value" of the case was $25,373,937.20, which included $1,255,329.95 for past medical expenses, $19,118,608 for future medical expenses, and $5,000,000 for non-economic loss, and that the $3,600,000 settlement thus represented a recovery of 14.19% of the claim's value. Therefore, according to Holly G., DHHR was only entitled to 14.19% of its reimbursement, or $79,053.16.[11] To prove past medical expenses, Holly G. offered into evidence the Medicaid lien letters from ODJFS, showing a total of $698,225.24, and DHHR, showing a total of $557,104.71. To prove future medical expenses and E.B.'s pain and suffering, Holly G. offered the discovery deposition of Gary Yarkony, M.D.,[12] dated October 2, 2009; a "life care plan" that Dr. Yarkony had prepared on June 11, 2008, in the underlying tort action; and the testimony of the guardian *ad litem* and Holly G. at the November 12, 2009, and December 21, 2009, proceed-

**8.** The provisions of W. Va.Code § 9–5–11 are quoted verbatim in footnote 20 *infra*.

**9.** A.B. is E.B.'s father.

**10.** DHHR represents that on January 29, 2010, the United States District Court for the Southern District of Ohio dismissed the medical malpractice action.

**11.** Holly G. likewise claimed that 14.19% of Ohio's claim was $99,078.16.

**12.** Dr. Yarkony is Board Certified in Physical Medicine and Rehabilitation and practices medicine in Illinois.

ings.[13] Holly G. also argued that because the case would have been tried in the United States District Court for the Southern District of Ohio, Eastern Division, the law of Ohio, specifically Ohio Revised Code § 2315.18(B)(3)(2005), which does not provide a cap to non-economic damages, would have applied.

In DHHR's Motion for Summary Judgment, DHHR contested the infant's claim that settlement could be apportioned by the court pursuant to *Ahlborn*. DHHR argued that under W. Va.Code § 9–5–11, DHHR has a priority right to full reimbursement for its expenses from any settlement and/or judgment recovered from a liable third party. Additionally, DHHR claimed that *Ahlborn* does not control because of the doctrine of *lex loci contractus*. In other words, because Petitioner and E.B. are citizens of West Virginia, and they contracted for Medicaid benefits in West Virginia, West Virginia law should apply to this dispute. Furthermore, DHHR submitted that W. Va.Code § 9–5–11 is not in conflict with *Ahlborn* because West Virginia statutory law limits West Virginia's recovery language to the "actual expenses paid by the State on behalf of the Medicaid recipient for which a third party is liable to the extent the Medicaid recipient is reimbursed for them." DHHR also asserted that the Legislature is the most appropriate entity to determine whether and to what extent DHHR is entitled to subrogation against E.B. and that they have determined a reasonable method for determining the State's medical reimbursements, i.e., that the recipient is free to negotiate a lower settlement with the State, and the State gets to decide on a case-by-case basis whether a lower settlement is warranted. DHHR further argued that Holly G. did not take into account the fact that E.B. will continue to be on Medicaid for the rest of his life and that it will have to expend money on behalf of E.B. in the future. Finally, DHHR argued that pursuant to W. Va.Code § 55–7B–8 (2008), E.B.'s damages are capped.

Following submission of the parties' briefs,[14] by letter dated February 26, 2010, the Circuit Court of Hancock County informed Holly G., DHHR, and ODJFS that "the Court [would] consider evidence relating to the full value of the minor's claim" and offered the parties "the opportunity to present additional evidence regarding the full value of the minor's claim." In response to the court's letter, DHHR submitted supplemental evidence in support of its motion for

---

**13.** The life care plan provided for twenty-four hours per day in-home nursing services at the RN or LPN level of care, various items of durable medical equipment and supplies, a handicapped-accessible home and vehicle, and a cell phone. Dr. Yarkony opined that E.B. has a life expectancy of fifty years "if he gets everything in my plan plus all treatment of any complications that arise." He testified that his "gross calculation" of future medical expenses "to a reasonable degree of medical probability" was $19,118,608–$19,191,768. This range included housing and upgrades to a house ($82,000–$99,500) along with a handicapped-equipped van ($8,840–$9,050) and cell phone. The bases of his opinion was his review of E.B.'s medical records from birth to 2007; his examination of E.B. on March 11, 2008, while E.B. was a patient in Pittsburgh Children's Hospital; a visit with E.B.'s mother and father in E.B.'s home in Chester, West Virginia; and the billed rates for medical equipment, supplies, and services he had obtained from various providers by calling them on the telephone. However, it appears that there are no documents from providers verifying these expenses. The highest medical expense item listed in the life care plan was for in-home nursing services ($306,000 per year), which Dr. Yarkony testified

was based on the billed rate in Chicago ($35.00 an hour).

Holly G. testified that Medicaid currently provides for sixteen hours a day nursing care for E.B. in their home and that she cares for him eight hours a day. She provided no medical bills, no evidence of any out-of-pocket medical expenses to date, and no evidence that medical expenses were paid from any source other than Medicaid. She provided no evidence of the economic value of her services to E.B. Holly G. further testified that she anticipates that Medicaid will continue to pay for E.B.'s future medical care.

The guardian *ad litem* opined that E.B.'s pain and suffering should be valued at between $5,000,000 and $10,000,000, that nothing should be paid to reimburse Medicaid, that $50,000 should be paid to Holly G. and $15,000 to A.B. for their damages, and that the net settlement proceeds should be placed into a special needs trust for the benefit of E.B.

**14.** The ODJFS also filed a brief on allocation of settlement funds to Ohio Medicaid. However, to the extent that ODJFS has not entered an appearance in this appeal, the substance of its circuit court brief need not be discussed herein.

summary judgment which included various affidavits and exhibits supporting DHHR's claims for subrogation.[15]

Thereafter, on July 12, 2010, the circuit court entered an order that approved the settlement, finding that *Ahlborn* applied in this case. The circuit court found that after reviewing the evidence regarding the extent of E.B.'s physical impairments, the past medical expenses paid, the projected future medical expenses based upon the life care plan presented by Dr. Yarkony,[16] and the guardian *ad litem* testimony regarding E.B.'s compensatory damages for pain and suffering, the full value of the claim was $25,373,937.95.[17] Based upon this finding, the court determined that the settlement represented 14.1878% of the full value of the minor's claim. Thus, the court found that DHHR was entitled to $79,040.82 and that ODJFS was entitled to $99,062.70. As to its findings regarding non-economic damages, the circuit court found that Ohio state law applied to the calculation of these damages because the underlying action was filed in the United States District Court for the Southern District of Ohio, Eastern Division. The court found that under Ohio law,[18] given the nature and extent of E.B.'s injuries, Ohio's damages cap would not apply in this case.

On July 26, 2010, DHHR filed a Motion for Stay of Order Regarding DHHR's Medicaid Subrogation Interests in Settlement Funds Pending Application for Appeal. On December 3, 2010, DHHR filed its Petition for Appeal with this Court. This Court granted DHHR's petition for appeal on March 10, 2011, and scheduled the matter for oral argument under Rule 20 of the Revised Rules of Appellate Procedure.

## II.

### STANDARD OF REVIEW

This Court has defined the scope of appellate review of a circuit court order as follows:

> In reviewing challenges to the findings and conclusions of the circuit court, we apply a two-prong deferential standard of review. We review the final order and the ultimate disposition under an abuse of discretion

15. Specifically, DHHR submitted the claims history for E.B. which showed both the billed rate and the amount actually paid by DHHR for all medical items and services provided to the minor between February 2007 and December 9, 2009. DHHR also submitted the affidavits of Patricia Miller, Director of the *Medicaid Management Information System, Operations and Information Technology Support*, and Rick Levock, Health Care Management Systems. DHHR asserted that the claims history revealed that since 2007, Maxim Healthcare has provided in-home skilled nursing services to E.B. and that its billed rate and paid rate of $14.50 per hour is the same, and less than the $35.00 per hour rate listed in Dr. Yarkony's life care plan. DHHR also contended that the only supplemental medical expenses may be eight hours a day nursing services at $14.50 per hour and that the proposed upgrades to the house and the provision of a vehicle are not covered by Medicaid. Additionally, DHHR submitted the Forms DFA–RR–1, "Rights and Responsibilities," signed by Holly G., which purport to assign to DHHR "benefits available to any Medicaid recipient from any third-party source as a result of injury, accident, or illness ... an amount up to, but not exceeding, the amount of Medicaid liability."

16. The circuit court's specific findings of fact regarding Dr. Yarkony's life care plan and testimony will be discussed more thoroughly below.

17. The circuit court found that based on the foregoing, the court was satisfied that E.B.'s total medical expenses, assuming he lives to be fifty years old were $19,118,608. The Court was satisfied based upon the evidence that the full value of both DHHR's lien and ODJFS's lien was $557,104.71 and $698,225.24 respectively. The circuit court noted that although a claim had been made for E.B.'s loss of future earning potential, no evidence had been provided to the Court regarding this claim. Thus, the court was unable to assign a value to the same. As for non-economic loss, the circuit court found that while the guardian *ad litem* was not qualified as an expert to give testimony in this area, the court nonetheless found the guardian *ad litem's* testimony instructive and found that $5,000,000 in compensatory damages was a reasonable figure in light of the damages that E.B. suffered.

18. As discussed more thoroughly below, Ohio Revised Code § 2315.18(B)(3) provides that the cap for non-economic damages in a tort action is not applicable where the injured party has sustained injuries which constitute "permanent and substantial physical deformity, loss of use of a limb, or loss of a bodily organ system" or "[p]ermanent physical functional injury that permanently prevents the injured person from being able to independently care for self and perform life-sustaining activities."

standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

Syl. Pt. 2, *Walker v. W. Va. Ethics Comm'n,* 201 W.Va. 108, 492 S.E.2d 167 (1997). The first issue in this case is a matter of first impression requiring a determination of whether W. Va.Code § 9–5–11 is preempted by federal law. "Preemption is a question of law reviewed *de novo*." Syl. Pt. 1, *Morgan v. Ford Motor Co.,* 224 W.Va. 62, 680 S.E.2d 77 (2009). To the extent that DHHR has also challenged the circuit court's findings of fact, we recognize that this Court should not disturb those findings on appeal "unless the evidence plainly and decidedly preponderates against such finding." *Stover v. Milam,* 210 W.Va. 336, 341, 557 S.E.2d 390, 395 (quoting Syl. Pt. 6, *Daugherty v. Ellis,* 142 W.Va. 340, 97 S.E.2d 33 (1956)). Guided by these principles, we will evaluate the parties' contentions in this case.

### III.

### DISCUSSION

DHHR presents four separate assignments of error in this appeal. First, it contends that the circuit court committed error in granting Holly G.'s motion for a proportional reduction of the State's recovery according to the ratio of the settlement amount to the full value of the case. Second, DHHR asserts that the circuit court committed error in ordering distribution of the net settlement proceeds to a special needs trust before satisfying DHHR's full reimbursement for past medical expenses it paid on behalf of E.B. Third, DHHR argues that the circuit court was without jurisdiction when it applied Ohio Revised Code § 2315.18(B)(3), Ohio's law which rendered Ohio's cap on non-economic damages inapplicable, to DHHR's reimbursement claim. Fourth, DHHR contends that Dr. Yarkony's opinion regarding future medical expenses was inadmissible under Rules 702 and 703 of the West Virginia Rules of Evidence, and thus, the circuit court committed clear error in relying on it. We will address each of these assigned errors in turn.

### A. Apportionment of Settlement Pursuant to *Ahlborn*

In asserting that the circuit court committed error in apportioning the settlement herein pursuant to the United States Supreme Court decision in *Ahlborn,* DHHR first contends that *Ahlborn* does not invalidate West Virginia's Medicaid subrogation statute, W. Va.Code § 9–5–11. Before we begin our analysis of W. Va.Code § 9–5–11 and the applicability of *Ahlborn,* we first set forth the applicable statutory framework and this Court's prior case law regarding Medicaid subrogation.

### 1. The Medicaid Program

Medicaid is a medical assistance program established by Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.* (2000), which provides joint federal and state funding of medical care for individuals who cannot afford to pay their own medical costs. Under this program, state governments cooperate with the federal government to provide medical services to eligible individuals and families. The federal government shares the costs of Medicaid with the states that elect to participate in this program. The Federal Government pays between 50% and 83% of the costs the State incurs for patient care,[19] and, in return, the State pays its portion of the costs and complies with certain statutory requirements for making eligibility determinations, collecting and maintaining information, and administering the program. *See* 42 U.S.C. § 1396a (2006 Ed.).

One such requirement is that the state Medicaid plan must require the state Medicaid agency to "take all reasonable measures to ascertain the legal liability of third parties ... to pay for care and services available under the plan ..." 42 U.S.C. § 1396a(a)(25)(A). Additionally, 42 U.S.C. § 1396a(a)(25)(B) requires that

in any case where such a legal liability is found to exist after medical assistance has

---

**19.** "The exact percentage of the federal contribution is calculated pursuant to a formula keyed to each State's per capita income." *Ahlborn,* 547 U.S. at 275 n. 4, 126 S.Ct. at 1758 n. 4 (citing 42 U.S.C. § 1396d(b) (2000)).

been made available on behalf of the individual and where the amount of reimbursement the State can reasonably expect to recover exceeds the costs of such recovery, the State or local agency will seek reimbursement for such assistance to the extent of such legal liability.

To facilitate its reimbursement from liable third parties, the State must,

to the extent that payment has been made under the State plan for medical assistance in any case where a third party has a legal liability to make payment for such assistance, [have] in effect laws under which, to the extent that payment has been made under the State plan for medical assistance for health care items or services furnished to an individual, the State is considered to have acquired the rights of such individual to payment by any other party for such health care items or services.

§ 1396a(a)(25)(H). A state's Medicaid plan must require an individual to assign the State that individual's rights to support and to payment for medical care from any third party as a condition of eligibility for Medicaid. 42 U.S.C. § 1396k(a)(1) (2006 Ed.). "[A]ny amount collected by the State under an assignment made ... shall be retained by the State as is necessary to reimburse it for medical assistance payments made on behalf of [the Medicaid recipient]." 42 U.S.C. § 1396k(b). The remainder of such amount collected shall be paid to the recipient. *Id.*

### 2. West Virginia's Medicaid Subrogation Act

Pursuant to West Virginia's Medicaid Subrogation Act, W. Va.Code § 9–5–11, DHHR has a subrogation right against the recovery a Medicaid recipient receives from third party tortfeasors.[20] This Court has examined

20. *The 2009 version of West Virginia's Medicaid Subrogation Act, W. Va.Code § 9–5–11, provides, in full:*

§ 9–5–11. **Assignment of rights; right of subrogation by Department of Health and Human Resources to the rights of recipients of medical assistance; rules as to effect of subrogation**

(a) Submission of an application to the Department of Health and Human Resources for medical assistance is, as a matter of law, an assignment of the right of the applicant or legal representative thereof to recovery from personal insurance or other sources, including, but not limited to, liable third parties, to the extent of the cost of medical services paid for by the Medicaid program. This assignment of rights does not extend to Medicare benefits: Provided, That the first $25,000 of the death benefit of a life insurance policy is exempt from assignment under the provisions of this section.

At the time the application is made, the department shall include a statement along with such application that explains that the applicant has assigned all such rights and the legal implications of making such assignment as provided in this section.

If medical assistance is paid or will be paid to a provider of medical care on behalf of a recipient of medical assistance because of any sickness, injury, disease or disability, and another person is legally liable for such expense, either pursuant to contract, negligence or otherwise, the Department of Health and Human Resources shall have a right to recover full reimbursement from any award or settlement for such medical assistance from such other person or from the recipient of such assistance if he or she has been reimbursed by the other

person. The department shall be legally assigned the rights of the recipient against the person so liable, but only to the extent of the reasonable value of the medical assistance paid and attributable to the sickness, injury, disease or disability for which the recipient has received damages. When an action or claim is brought by a medical assistance recipient or by someone on his or her behalf against a third party who may be liable for the injury, disease, disability or death of a medical assistance recipient, any settlement, judgment or award obtained is subject to the claim of the Department of Health and Human Resources for reimbursement of an amount sufficient to reimburse the department the full amount of benefits paid on behalf of the recipient under the medical assistance program for the injury, disease, disability or death of the medical assistance recipient. The claim of the Department of Health and Human Resources assigned by such recipient shall not exceed the amount of medical expenses for the injury, disease, disability or death of the recipient paid by the department on behalf of the recipient. The right of subrogation created in this section includes all portions of the cause of action, by either settlement, compromise, judgment or award, notwithstanding any settlement allocation or apportionment that purports to dispose of portions of the cause of action not subject to the subrogation. Any settlement, compromise, judgment or award that excludes or limits the cost of medical services or care shall not preclude the Department of Health and Human Resources from enforcing its rights under this section. The secretary may compromise, settle and execute a release of any such claim, in whole or in part.

W. Va.Code § 9–5–11 on three previous occasions.

In *Kittle v. Icard*, 185 W.Va. 126, 128, 405 S.E.2d 456, 458 (1991), the issue presented was whether DHHR was entitled to full reimbursement for medical expenses it paid on behalf of a minor from a $100,000 settlement which did not fully compensate the accident victim for his injuries. The trial court applied the "made whole" rule, which required that an insured must be fully compensated for injuries before an insurance carrier's subrogation rights arise, and denied DHHR full reimbursement for medical expenses it had paid. *Id.* at 128–29, 405 S.E.2d at 458–59.

This Court held that although DHHR was legally subrogated to any right a medical assistance recipient may have to recover against the legally liable third party under 42 U.S.C. § 1396a(a)(25)(1982 Ed.) and W. Va. Code § 9–5–11(a)(1990), a question remained with regard to how the doctrine of subrogation should be applied under the statute. *Kittle*, 185 W.Va. at 130, 405 S.E.2d at 460. In resolving this issue, this Court held that the usual and ordinary definition of subrogation should be applied unless the Legislature clearly expresses an intent within the statute to give subrogation a different meaning. *Id.* Finding no intent by the Legislature that the

(b) Nothing in this section shall be construed so as to prevent the recipient of medical assistance from maintaining an action for injuries received by him or her against any other person and from including therein, as part of the compensatory damages sought to be recovered, the amount or amounts of his or her medical expenses, even though such person received medical assistance in the payment of such medical expenses, in whole or in part. If the action be tried by a jury, the jury shall not be informed as to the interest of the Department of Health and Human Resources, if any, and such fact shall not be disclosed to the jury at any time. The trial judge shall, upon the entry of judgment on the verdict, direct that an amount equal to the amount of medical assistance given be withheld and paid over to the Department of Health and Human Resources. Irrespective of whether the case be terminated by judgment or by settlement without trial, from the amount required to be paid to the Department of Health and Human Resources there shall be deducted the attorney fees attributable to such amount in accordance with and in proportion to the fee arrangement made between the recipient and his or her attorney of record so that the department shall bear the pro rata portion of such attorney fees. Nothing in this section shall preclude any person who has received medical assistance from settling any cause of action which he or she may have against another person and delivering to the Department of Health and Human Resources, from the proceeds of such settlement, the sums received by him or her from the department or paid by the department for his or her medical assistance. If such other person is aware of or has been informed of the interest of the Department of Health and Human Resources in the matter, it shall be the duty of the person to whose benefit the release inures to withhold so much of the settlement as may be necessary to reimburse the department to the extent of its interest in the settlement. No judgment, award of or settlement in any action or claim by a medical assistance recipient to recover damages for injuries, disease or disability, in which the Department of Health and Human Resources has interest, shall be satisfied without first giving the department notice and reasonable opportunity to establish its interest. The department shall have sixty days from receipt of such written notice to advise the recipient or his or her representative in writing of the department's desire to establish its interest through the assignment. If no such written intent is received within the sixty-day period, then the recipient may proceed and in the event of full recovery forward to the department the portion of the recovery proceeds less the department's share of attorney's fees and costs expended in the matter. In the event of less than full recovery the recipient and the department shall agree as to the amount to be paid to the department for its claim. If there is no recovery, the department shall under no circumstances be liable for any costs or attorney's fees expended in the matter. If, after being notified in writing of a subrogation claim and possible liability of the recipient, guardian, attorney or personal representative for failure to subrogate the department, a recipient, his or her guardian, attorney or personal representative disposes of the funds representing the judgment, settlement or award, without the written approval of the department, that person shall be liable to the department for any amount that, as a result of the disposition of the funds, is not recoverable by the department. In the event that a controversy arises concerning the subrogation claims by the department, an attorney shall interplead, pursuant to rule twenty-two of the Rules of Civil Procedure, the portion of the recipient's settlement that will satisfy the department exclusive of attorney's fees and costs regardless of any contractual arrangement between the client and the attorney.

(c) Nothing contained herein shall authorize the Department of Health and Human Resources to institute a class action or multiple plaintiff action against any manufacturer, distributor or vendor of any product to recover medical care expenditures paid for by the Medicaid program.

usual and ordinary definition of subrogation should not apply, and in light of the equitable principles underlying the doctrine of subrogation, this Court held in *Kittle* that the right to subrogation may be limited by the made-whole rule. *Id.* at 134, 405 S.E.2d at 464.

■ Following this Court's decision in *Kittle*, our Legislature amended W. Va.Code § 9–5–11 in 1993 and again in 1995. In 1997, in *Grayam v. Dep't. of Health and Human Res.*, 201 W.Va. 444, 498 S.E.2d 12 (1997), this Court analyzed whether the made-whole rule still applied to DHHR's subrogation rights following the 1993 and 1995 amendments to W. Va.Code § 9–5–11. This Court found that the statute nullified the made-whole rule and allowed DHHR to recover all payments expended for medical assistance paid on behalf of its recipient.[21] In analyzing the effects of the 1993 and 1995 amendments, this Court specifically held in Syllabus Point 2 of *Grayam*,

> In both the 1993 and 1995 amendments to West Virginia Code § 9–5–11 (Supp.1993 & Supp.1995), the legislature rendered the made-whole rule inapplicable by clearly and unambiguously modifying the usual and ordinary meaning of subrogation as it is used in that statute. Pursuant to these amendments, if another person is legally liable to pay for medical assistance provided by the Department of Health and Human Resources, the Department possesses

a priority right to recover full reimbursement from any settlement, compromise, judgment, or award obtained from such other person or from the recipient of such assistance if he or she has been reimbursed by the other person.

Two years later, in *Anderson v. Wood*, 204 W.Va. 558, 562, 514 S.E.2d 408, 412 (1999), this Court examined whether W. Va.Code § 9–5–11(b) required DHHR to pay a pro rata share of costs and attorney fees when a Medicaid recipient recovers from a tortfeasor. This Court held that DHHR is liable for its pro rata share of the costs and attorneys fees incurred by the recipient in recovering his or her medical expenses, and concluded that "[f]undamental fairness requires that DHHR assume its pro rata share of the litigation costs incurred when obtaining reimbursement for medical payments expended on behalf of a recipient." *Id.* at 565, 514 S.E.2d at 415.

Seven years after this Court's decision in *Anderson*, the United States Supreme Court rendered the *Ahlborn* opinion, which is presently the controlling federal precedent on Medicaid reimbursement statutes. The case *sub judice* presents the first opportunity that this Court has had to examine W. Va.Code § 9–5–11 following the United States Supreme Court's decision in *Ahlborn*.[22]

---

**21.** This Court noted in *Grayam* that the language from the 1993 amendment clearly and unambiguously mandated that DHHR " 'shall have a right to recover *full reimbursement*' without regard to '[a]ny settlement, compromise, judgment or award that excludes or limits the cost of medical *services or care* ...' " 201 W.Va. at 451, 498 S.E.2d at 19. The statute was further found to provide that the " 'right of subrogation created in this section includes all portions of the cause of action ... notwithstanding any settlement allocation or apportionment' and that [DHHR was] entitled to 'the full amount of benefits paid' from 'any settlement, judgment or award obtained ...' " *Id.* (quoting W. Va.Code § 9–5–11(a)). This Court found that "in light of *Kittle* and the remaining portion of W. Va.Code § 9–5–11 (Supp.1993), this language, without doubt, gives [DHHR] a superior right to be *fully* reimbursed from any settlement, compromise, judgment or award obtained from a liable third party." *Id.* This Court also noted that "[u]nlike the original version of the statute, the legislature obviously

took action after the *Kittle* decision to amend the statute and altered the usual and ordinary definition of subrogation to give [DHHR] a priority right to receive reimbursement from any monies obtained from a liable third party." *Id.* Accordingly, this Court found that "[t]he plain meaning to be drawn from the changes is that, irrespective of the made-whole rule, [DHHR] shall have a right to full reimbursement." *Id.* This Court went on to find that a similar conclusion was reached with respect to the 1995 amendment as was reached with the 1993 amendment, as the language "abrogating the usual and ordinary definition of subrogation in the 1993 version was carried over verbatim in the 1995 version of the statute." *Id.* at 20–21, 498 S.E.2d at 452–53.

**22.** The most recent amendments made to W. Va.Code § 9–5–11 following the 1995 amendments discussed in *Grayam* and *Anderson* were effective July 10, 2009. The changes made by the 2009 amendments are not relevant for purposes of the instant appeal.

### 3. Ahlborn

Heidi Ahlborn was injured on January 2, 1996, as a result of a motor vehicle accident which occurred in Arkansas. *Ahlborn*, 547 U.S. at 272–73, 126 S.Ct. at 1757. She was nineteen years old at the time of the accident in which she suffered severe and permanent injuries that left her brain damaged and unable to complete her college education. *Id.* Ahlborn's assets were insufficient to cover her medical costs, whereupon the Arkansas Department of Health & Human Services ("ADHS") determined that she was eligible for medical assistance. *Id.* at 273, 126 S.Ct. at 1757. ADHS paid a total of $215,645.30 on behalf of Ahlborn for medical care. *Id.*

On April 11, 1997, Ahlborn filed a personal injury suit against two alleged tortfeasors. *Id.* As part of her suit, Ahlborn claimed past and future medical expenses, permanent physical injury, past and future pain, suffering, mental anguish, past loss of earnings and working time, and permanent impairment of ability to earn in the future. *Id.* ADHS intervened in the case in February 1998 to assert a lien on the proceeds of any third-party recovery Ahlborn might obtain. The case was eventually settled out of court for $550,000. *Id.* at 274, 126 S.Ct. at 1757. The parties did not allocate the settlement between categories of damages. ADHS asserted a lien against the settlement proceeds in the amount of $215,645.30, or the total amount paid out by ADHS for Ahlborn's medical care. *Id.*

On September 30, 2002, Ahlborn filed an action in the United States District Court for the Eastern District of Arkansas seeking declaration that the lien asserted by ADHS violated federal Medicaid laws insofar as full satisfaction of the same would require depletion of compensation for injuries other than past medical expenses. *Id.* Importantly, in order to facilitate the district court's resolution of the legal questions presented, the parties stipulated that Ahlborn's entire claim was reasonably valued at $3,040,708.12; that the settlement amounted to approximately one-sixth of that sum; and that if Ahlborn's construction of federal law was correct, ADHS would be entitled to only the portion of the settlement that constituted reimburse-

ment for medical payments made, or $35,581.47. *Id.*

After considering cross-motions for summary judgment, the United States District Court for the Eastern District of Arkansas held that, under Arkansas law, Ahlborn had assigned to ADHS her right to any recovery from the third-party tortfeasors to the full extent of Medicaid's payments for her benefit. *Id.* at 274, 126 S.Ct. at 1758. Accordingly, ADHS was entitled to a lien in the amount of $215,645.30. The Eighth Circuit reversed, holding that the ADHS was entitled to only that portion of the settlement that represented payments for medical care. *Id.* at 275, 126 S.Ct. at 1758. The United States Supreme Court affirmed the ruling of the Eighth Circuit. *Id.*

In its opinion, the United States Supreme Court reviewed Arkansas' statute, which required a Medicaid applicant to "automatically assign his or her right to any settlement, judgment, or award which may be obtained against any third party to [ADHS] to the full extent of any amount which may be paid by Medicaid for the benefit of the applicant." *Id.* at 277, 126 S.Ct. at 1759 (quoting Ark. Code Ann. § 20–77–307(a)). As a result, " '[w]hen medical assistance benefits are provided' to the recipient 'because of injury, disease, or disability for which another person is liable,' ADHS 'shall have a right to recover from the person the cost of benefits so provided.' " *Id.* (quoting Ark.Code Ann. § 20–77–301(a)).

In its opinion, the United States Supreme Court noted that "[t]he State, through this statute, claims an entitlement to more than just that portion of a judgment or settlement that represents payment for medical expenses. It claims a right to recover the entirety of the costs it paid on the Medicaid recipient's behalf." *Id.* at 278, 126 S.Ct. at 1760. The Court went on to explain that the federal third-party liability provisions of the federal Medicaid statute focused on recovery of payments for medical care, rather than the amount paid out by State Medicaid programs. *Id.* at 280, 126 S.Ct. at 1761. It specifically noted that "Medicaid recipients must, as a condition of eligibility, 'assign the State any rights ... *to payment for medical*

*care* from any third party,' 42 U.S.C. 1396k(a)(1)(A)(emphasis added), not rights to payment for, for example, lost wages." *Id.*

According to the United States Supreme Court in *Ahlborn,* under the third-party lien provisions of the Medicaid law,

the State must be assigned "the rights of [the recipient] to payment by any other party *for such health care items or services.*" 1396a(a)(25)(H)(emphasis added.) Again, the statute does not sanction an assignment of rights to payment for anything other than medical expenses—not lost wages, not pain and suffering, not an inheritance.

. . .

The "amount recovered … under an assignment" is not, as ADHS assumes, the entire settlement; as explained above, under the federal statute the State's assigned rights extend only to recovery of payments for medical care. Accordingly, *what § 1396k(b) requires is that the State be paid first out of any damages representing payments for medical care before the recipient can recover any of her own costs for medical care.*

*Id.* at 281–82, 126 S.Ct. at 1761–62 (emphasis added). Thus, by its language, the United States Supreme Court found that "the federal third-party liability provisions *require* an assignment of no more than the right to recover that portion of a settlement [or judgment] that represents payments for medical care." *Id.* at 282, 126 S.Ct. at 1762.

The *Ahlborn* Court also reasoned that the anti-lien provision of the Medicaid law supported its conclusion that ADHS's recovery was limited to that portion of the settlement representing medical expenses, to wit:

If there were no other relevant provisions in the federal statute, the State might plausibly argue that federal law supplied a recovery "floor" upon which States were free to build. In fact, though, the federal statute places express limits on the State's powers to pursue recovery of funds it paid on the recipient's behalf. These limitations are contained in 42 U.S.C. §§ 1396a(a)(18) and 1396p. Section 1396a(a)(18) requires that a state Medicaid plan comply with § 1396p, which in turn prohibits States

(except in circumstances not relevant here) from placing liens against, or seeking recovery of benefits paid from, a Medicaid recipient:

"(a) Imposition of lien against property of an individual on account of medical assistance rendered to him under a State plan

"(1) No lien may be imposed against the property of any individual prior to his death on account of medical assistance paid or to be paid on his behalf under the State plan, except—

"(A) pursuant to the judgment of a court on account of benefits incorrectly paid on behalf of such individual, or

"(B) [in certain circumstances not relevant here]

. . . . .

"(b) Adjustment or recovery of medical assistance correctly paid under a State plan

"(1) No adjustment or recovery of any medical assistance correctly paid on behalf of an individual under the State plan may be made, except [in circumstances not relevant here]." § 1396p.

. . .

There is no question that the State can require an assignment of the right, or chose in action, to receive payments for medical care. So much is expressly provided for by §§ 1396a(a)(25) and 1396k(a). And we assume, as do the parties, that the State can also demand as a condition of Medicaid eligibility that the recipient "assign" in advance any payments that may constitute reimbursement for medical costs. To the extent that the forced assignment is expressly authorized by the terms of §§ 1396a(a)(25) and 1396k(a), it is an exception to the anti-lien provision. See *Washington State Dep't of Social and Health Servs. v. Guardianship Estate of Keffeler,* 537 U.S. 371, 383–385, and n. 7, 123 S.Ct. 1017, 154 L.Ed.2d 972 (2003). But that does not mean that the State can force an assignment of, or place a lien on, any other portion of Ahlborn's property. As explained above, the exception carved

out by §§ 1396a(a)(25) and 1396k(a) is limited to payments for medical care. Beyond that, the anti-lien provision applies. *Id.* at 283–85, 126 S.Ct. at 1762–63.

Harmonizing the federal anti-lien provision, § 1396p, with § 1396a(a)(25) and § 1396k(a), the Court held that the Arkansas statute found "no support in the federal third-party liability provisions, and in fact squarely conflict[ed] with the anti-lien provision of the federal Medicaid laws." *Id.* at 280, 126 S.Ct. at 1760. Thus, the Court found that ADHS could not lay claim to more than the portion of Ahlborn's settlement that represented medical expenses. *Id.* at 284–85, 126 S.Ct. at 1763. In discussing ADHS's argument that reimbursement of the full Medicaid lien is needed to avoid risk of settlement manipulation, the Supreme Court suggested that such a risk can be avoided by "the State's advance agreement to an allocation, or, if necessary, by submitting the matter to a court for decision." *Id.* at 288, 126 S.Ct. at 1765.

### 4. Validity of W. Va.Code § 9–5–11 following *Ahlborn*

 The authority of federal law to preempt state law is found in the Supremacy Clause of the United States Constitution, which provides:

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Const. art. VI, cl. 2. This Court has held that "[t]he Supremacy Clause of the United States Constitution, Article VI, Clause 2, invalidates state laws that interfere with or are contrary to federal law." Syl. Pt. 1, *Cutright v. Metro. Life Ins. Co.*, 201 W.Va. 50, 491 S.E.2d 308 (1997). "Nevertheless, our law has a bias against preemption." *Morgan v. Ford Motor Co.*, 224 W.Va. 62, 68, 680 S.E.2d 77, 83 (2009). "Given the importance of federalism in our constitutional structure ... we entertain a strong presumption that federal statutes do not preempt state laws; particularly those laws directed at subjects—like health and safety—'traditionally governed' by the states." *Davis v. Eagle Coal & Dock Co.*, 220 W.Va. 18, 22, 640 S.E.2d 81, 85 (2006) (quoting *Law v. Gen. Motors Corp.*, 114 F.3d 908, 909–10 (9th Cir.1997)). Therefore, "preemption is disfavored in the absence of convincing evidence warranting its application." *Davis*, 220 W.Va. at 22–23, 640 S.E.2d at 85–86 (quoting *Hartley Marine Corp. v. Mierke*, 196 W.Va. 669, 673, 474 S.E.2d 599, 603 (1996)).

 "When it is argued that a state law is preempted by a federal law, the focus of analysis is upon congressional intent." Preemption "is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Morgan v. Ford Motor Co.*, 224 W.Va. at 69, 680 S.E.2d at 84 (footnote omitted) (quoting *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977)). Implied preemption may take two forms:

[I]n the absence of explicit statutory language signaling an intent to pre-empt, we infer such intent where Congress has legislated comprehensively to occupy an entire field of regulation, leaving no room for the states to supplement federal law, or where the state law at issue conflicts with federal law, either because it is impossible to comply with both or because the state law stands as an obstacle to the accomplishment and execution of congressional objectives[.]

*Davis*, 220 W.Va. at 23, 640 S.E.2d at 86 (quoting *Hartley Marine Corp.*, 196 W.Va. at 674, 474 S.E.2d at 604).

 Congress did not expressly provide for preemption in its Medicaid legislation. Rather, Congress specifically permitted state action regarding Medicaid; in fact, it required that a participating state's Medicaid plan conform to federal requirements. *Martin ex rel. Hoff v. City of Rochester*, 642 N.W.2d 1, 11 (Minn.2002) (citing *Schweiker v. Gray Panthers*, 453 U.S. 34, 101 S.Ct. 2633, 69 L.Ed.2d 460 (1981)); *see also* 42 U.S.C. § 1396a(a). Thus, Congress did not legislate

comprehensively so as to occupy the entire field of Medicaid regulation. It instead left room for the states to supplement federal law. Accordingly, preemption will apply only if state law conflicts with Federal Medicaid law or if its application presents an obstacle to federal Medicaid purposes. *See also Lankford v. Sherman,* 451 F.3d 496, 510 (8th Cir.2006); *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n,* 461 U.S. 190, 203–04, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983) (noting that where Congress has not expressly preempted or entirely displaced state regulation in a specific field, as with the Medicaid Act, "state law is preempted to the extent that it actually conflicts with federal law."). An actual conflict arises where compliance with both state and federal law is a "physical impossibility," or where the state law " 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *Id.* (quoting *Fla. Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963) and *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)). This Court has held that "it is by now axiomatic that the manner in which a state administers a federal assistance program must be consistent with federal law." *Harrison v. Ginsberg,* 169 W.Va. 162, 167, 286 S.E.2d 276, 280 (1982) (citations omitted).

Additionally, West Virginia Code § 9–2–3(1970) provides,

The State assents to the purposes of federal-state assistance and federal assistance, accepts federal appropriations and other forms of assistance made under or pursuant thereto, and authorizes the receipt of such appropriations into the State Treasury and the receipt of other forms of assistance by the department for expenditure, disbursement, and distribution by the department in accordance with the provisions of this chapter *and the conditions imposed by applicable federal laws, rules and regulations.*

*Id.* (emphasis added). Therefore, we must consider whether W. Va.Code § 9–5–11 conflicts with or is an obstacle to federal Medicaid law. In the present case, the circuit court found that W. Va.Code § 9–5–11 was in conflict with federal Medicaid law pursuant to the United States Supreme Court decision in *Ahlborn,* and thus was preempted because the West Virginia Code "seems to give a priority right to WV DHHR for full reimbursement of any monies it expended on behalf of a recipient without regard to whether the monies received by the recipient, either by settlement or judgment, were meant to compensate the recipient for past medical costs, or some other loss, such as lost wages, pain and suffering, ... etc." On appeal, DHHR contends that the *Ahlborn* decision did not affect the State's ability to assert its priority to recovery of damages attributable to medical expenses. DHHR asserts that the central focus of *Ahlborn* was not whether a state could assert its priority right against and seek reimbursement from a Medicaid recipient's entire settlement but, instead, was whether Arkansas' *stipulation* concerned the portion of the settlement attributable to medical expenses. DHHR maintains that *Ahlborn* is controlling precedent only when there has been a prior determination of medical expenses by a jury (or trial judge in a case tried without a jury) or a stipulation as to the medical expenses portion of a plaintiff's settlement. DHHR contends that in those cases, the State may not receive reimbursement in excess of the portion so designated. Here, there was no such determination or stipulation.

DHHR asserts that W. Va.Code § 9–5–11 provides a method for determining the State's reimbursement in the absence of judicial allocation that is consistent with federal law. DHHR maintains that under the language of the statute, it is only seeking reimbursement out of the medical expenses portion of the settlement. DHHR contends that West Virginia has determined that the State may only recover the amount of medical expenses paid by DHHR reduced by DHHR's pro rata share of attorneys fees and proportionate share of the legal costs incurred by the Medicaid recipient in obtaining the settlement. DHHR avers that this typically reduces the State's recovery by more than 40%, and thus, it can never receive "full reimbursement." DHHR also points out that if the settlement amount is less than the

amount paid by DHHR, the Secretary authorizes DHHR to limit its recovery to one third of the gross amount obtained. DHHR argues that these provisions were absent in the Arkansas statute, and thus, the Arkansas statute violated the federal anti-lien provision because Arkansas sought to impose a lien beyond the portion of the settlement allocated to medical care.

DHHR contends that in West Virginia, the net amount (after the statutorily mandated deduction and any discretionary deduction) essentially defines the portion of the settlement that represents "payment for medical expenses" in cases, such as the instant one, involving a lump settlement. DHHR cites to decisions rendered in North Carolina and Florida wherein state Medicaid reimbursement statutes, which provided methods of statutory allocation rather than judicial allocation, were held to be in compliance with *Ahlborn*. *See Armstrong v. Cansler*, 722 F.Supp.2d 653 (W.D.N.C.2010), *vacated by E.M.A. ex rel. Plyler v. Cansler*, 674 F.3d 290 (4th Cir.2012); *Andrews ex rel. Andrews v. Haygood*, 362 N.C. 599, 669 S.E.2d 310 (N.C.2008); *Russell v. Agency for Health Care Admin.*, 23 So.3d 1266 (Fla.Dist.Ct.App. 2010); *Scharba v. Everett L. Braden, Ltd.*, No. 8:07–cv–1294–T–33EAJ, 2010 WL 1380121 (M.D.Fla. March 31, 2010). DHHR asserts that the statutory reduction of DHHR's pro rata share of attorneys fees and costs is a fair balance providing a reasonable method for determining the State's medical reimbursements, while also protecting the recipient's interests.

Conversely, Holly G. contends that W. Va. Code § 9–5–11 is in conflict with *Ahlborn* because nothing in the statute limits DHHR's recovery to the portion of the settlement or judgment attributable to medical expenses. Holly G. maintains that *Ahlborn* broadly prohibits a state from claiming reimbursement out of funds not earmarked solely for medical expenses under any circumstances. Accordingly, Holly G. asserts that the *Ahlborn* decision is not limited to cases where the parties have stipulated to the value of the plaintiff's claim or where there has been an allocation of damages on the merits. Rather, DHHR cannot recover reimburse-ment from a Medicaid recipient's entire settlement in circumstances where there has been no stipulation. Holly G. believes that nothing in *Ahlborn* limits the application of its central principle—that any reimbursement must comply with the federal anti-lien provision and be limited to the portion of damages attributable to past medical expenses.

Holly G. suggests that when a settlement does not contain an allocation delineating damages specifically designated for medical expenses, *Ahlborn* requires states to fashion a method to make those determinations and protect their right to reimbursement, such as by agreement or by submitting the matter to a court for adjudication. Holly G. argues that the indispensable step of any analysis is determining what portion of a settlement is attributable to medical expenses. If W. Va. Code § 9–5–11 is applied as DHHR contends, Holly G. argues that it allows the State to receive monies not attributable to medical expenses. To the extent that W. Va.Code § 9–5–11 makes no distinction with respect to the type of damages recovered by a plaintiff, but rather only provides the upper limit of the State's recovery, it violates the anti-lien provisions of the federal Medicaid statutes.

▆ After a thorough examination of the *Ahlborn* decision and the language contained in W. Va.Code § 9–5–11, for the reasons expressed more thoroughly below, we find that W. Va.Code § 9–5–11 directly conflicts with *Ahlborn*, insofar as it permits DHHR to assert a claim to more than the portion of a recipient's settlement that represents past medical expenses. First, we are not convinced, as DHHR contends, that *Ahlborn* is limited to cases where the parties have stipulated to the value of the plaintiff's claim. In analyzing the *Ahlborn* opinion, we find that nothing limits its application in the manner suggested by DHHR. In *Ahlborn*, the United States Supreme Court rejected the contention that the entire settlement was subject to the State's claim for reimbursement, holding that "the State's assigned rights extend only to recovery of payments for medical care." 547 U.S. at 282, 126 S.Ct. at 1752. In addressing the stipulation made by the parties

in *Ahlborn,* the United States Supreme Court found that "the effect of the stipulation is the same as if a trial judge had found that Ahlborn's damages amounted to $3,040,708.12 (of which $215,645.30 were for medical expenses), but because of her contributory negligence, she could only recover one-sixth of those damages." *Ahlborn,* 547 U.S. at 281 n. 10, 126 S.Ct. at 1761–62, n. 10. The Court went on to explain that in cases where a settlement had been reached but no allocation had been made, the same principles applied. The Court discussed the parties' alternative policy arguments regarding full reimbursement rules. The ADHS's and the United States' briefs argued that a rule of full reimbursement was needed generally to avoid the risk of settlement manipulation. The United States Supreme Court found this argument unpersuasive and noted that although the issue was not squarely presented in that particular case because ADHS had stipulated that only $35,581.47 of Ahlborn's settlement proceeds were properly designated as payments for medical costs,

> [e]ven in the absence of such a post-settlement agreement, . . . the risk that parties to a tort suit will allocate away the State's interest can be avoided either by obtaining the State's advance agreement to an allocation or, if necessary, by submitting the matter to a court for decision. For just as there are risks in underestimating the value of readily calculable damages in settlement negotiations, so also is there a countervailing concern that a rule of absolute priority might preclude settlement in a large number of cases, and be unfair to the recipient in others.

*Id.* at 288, 126 S.Ct. at 1765 (footnotes omitted).

*Ahlborn* unequivocally held that state liens are invalid if they attach to non-medical damage recoveries. The federal Medicaid anti-lien statutes allow a narrow exception for liens that are limited to recoveries only for medical expenses. In order to ensure that states are not forcing an assignment of, or placing a lien on, any other portion of a recipient's property, *Ahlborn* effectively requires a determination of what portion of a settlement is attributable to medical expenses.

Other courts interpret *Ahlborn* in the same manner. For example, following briefing and oral argument in the instant case, the Fourth Circuit Court of Appeals had the opportunity to apply *Ahlborn* in assessing the propriety of North Carolina's Medicaid program and found that *Ahlborn* is properly understood to prohibit recovery by the State of more than the amount of settlement proceeds representing payment for medical care already received. In *E.M.A. ex rel. Plyler v. Cansler,* 674 F.3d 290 (4th Cir.2012), the minor appellant, E.M.A. (born February 2000) sustained serious injuries at birth due to the negligence of the medical professionals who attended to her delivery. *Id.* As a result of her injuries, she was legally deaf and blind, and was unable to sit, walk, crawl, or talk. She also suffered from mental retardation and a seizure disorder. *Id.* The North Carolina Department of Health and Human Services ("DHHS"), through a state Medicaid program, paid more than $1.9 million in medical and healthcare expenses on her behalf. *Id.* The medical malpractice action was settled for a lump sum of approximately $2.8 million, which is a sum in excess of the total Medicaid expenditures of approximately $1.9 million but below the full value of all the tort claims. *Id.* The settlement agreement did not allocate separate amounts for past medical expenses and other damages. *Id.*

DHHS subsequently asserted a statutory lien on the settlement proceeds pursuant to N.C. Gen.Stat. §§ 108A–57 and –59, which provide that North Carolina has a subrogation right to, and may assert a lien upon, the lesser of its actual medical expenditures or one-third of the Medicaid recipient's total recovery. *Id.* at 292. Thus, under the circumstances described, where DHHS's actual medical expenditures are greater than one-third of the settlement funds, the North Carolina third-party liability statutes effected an unrebuttable presumption that the State is entitled to one-third of the total settlement proceeds recovered by E.M.A. and her parents. *Id.* The parties did not dispute the State's entitlement to some reimbursement from the lump-sum settlement, but they vig-

orously disputed the proper allocation of the portion of the settlement proceeds held in trust by the state court. Appellants brought the action in federal district court against Mr. Cansler, in his official capacity as Secretary of DHHS, seeking declaratory and injunctive relief pursuant to 42 U.S.C. § 1983. *Id.* They sought to forestall payment of the amount claimed by DHHS on the basis of the "anti-lien provision," 42 U.S.C. § 1396p, which was discussed in *Ahlborn. Id.* at 293.

On cross-motions for summary judgment, the district court in *Armstrong,* 722 F.Supp.2d 653 (W.D.N.C.2010), relying in significant part on the reasoning of a majority opinion in a prior case by a divided Supreme Court of North Carolina, *Andrews ex rel. Andrews v. Haygood,* 362 N.C. 599, 669 S.E.2d 310, *cert. denied sub nom. Brown v. N.C. Dep't of Health & Human Servs.,* — U.S. ——, 129 S.Ct. 2792, 174 L.Ed.2d 291 (2009), which distinguished *Ahlborn* while sustaining North Carolina's state statutory regime, granted summary judgment in favor of appellee, Secretary Cansler. *Id.* at 295. The *Andrews* decision adopted a narrow interpretation of *Ahlborn* limiting its holding to cases in which the parties have stipulated to or otherwise allocated settlement proceeds between different categories of damages, thereby identifying a sum certain for medical expenses. *Andrews,* 669 S.E.2d at 313.

On appeal, the Fourth Circuit reversed *Armstrong* disagreeing with the analysis of the Supreme Court of North Carolina in *Andrews,* as adopted by the district court. The Fourth Circuit found that the *Ahlborn* court addressed the specific issue of "whether [ADHS] can lay claim to more than the portion of [the recipient's] settlement that represents medical expenses." *Cansler,* 674

F.3d at 307 (quoting *Ahlborn,* 547 U.S. at 280, 126 S.Ct. 1752). Thus, the Fourth Circuit concluded that the *Ahlborn* court in no way rested its analysis of this issue on whether there has been a prior determination or stipulation as to the medical expenses portion of a Medicaid recipient's settlement. *Id.* Based upon these conclusions, it was persuaded that the unrebuttable presumption inherent in the one-third cap on the State's recovery imposed by the North Carolina third-party liability statutes is in fatal conflict with federal law as interpreted by *Ahlborn. Id.* at 293. The Fourth Circuit stated the following:

> [w]e hold that the North Carolina third-party liability statutes, N.C. Gen.Stat. §§ 108A–57 and –59, as applied in this case, fail to comply with federal Medicaid law as interpreted by the Supreme Court in *Ahlborn.* As the unanimous *Ahlborn* Court's decision makes clear, federal Medicaid law limits a state's recovery to settlement proceeds that are shown to be properly allocable to past medical expenses. In the event of an unallocated lump-sum settlement exceeding the amount of the state's Medicaid expenditures, as in this case, the sum certain allocable to medical expenses must be determined by way of a fair and impartial adversarial procedure that affords the Medicaid beneficiary an opportunity to rebut the statutory presumption in favor of the state that allocation of one-third of a lump sum settlement is consistent with the anti-lien provision in federal law.

*Id.* at 312. In addition to the *Cansler* court, the majority of other courts interpreting *Ahlborn* have also acknowledged that it stands for this same proposition.[23]

**23.** *See Bolanos v. Superior Court,* 169 Cal. App.4th 744, 87 Cal.Rptr.3d 174, 180 (2008)("The fundamental point is that a settlement that does not distinguish between past medical expenses and other damages must be allocated between these two classes of recoveries. Without such an allocation, the principle set forth in *Ahlborn,* that the state cannot recover for anything other than past medical expenses, cannot be carried into effect."); *see also Lugo v. Beth Israel Med. Ctr.,* 13 Misc.3d 681, 819 N.Y.S.2d 892, 896 (N.Y.Sup.2006) (finding that *"Ahlborn* must be read to limit the DDS recoupment to the amount of the settlement proceeds allocated to

past medical expenses. To the extent that the *Cricchio* [*v. Pennisi, et al.,* 90 N.Y.2d 296, 660 N.Y.S.2d 679, 683 N.E.2d 301 (1997)] or *Gold* [*v. United Health Services Hospitals, Inc., et al.,* 95 N.Y.2d 683, 723 N.Y.S.2d 117, 746 N.E.2d 172 (2001)] decisions suggest otherwise, *Ahlborn* implicitly overrules them." Court also found that *Ahlborn* required it to hold a hearing to determine full value of the claim and allocate settlement.); *McKinney ex rel. Gage v. Philadelphia Hous. Auth.,* No. 07–4432, 2010 WL 3364400, slip op. at 4 (E.D.Pa. Aug. 24, 2010) (noting that *Ahlborn* rejected the argument that a rule of full reimbursement was necessary to

Accordingly, we are not persuaded by those decisions relied upon by DHHR holding that state Medicaid reimbursement statutes comply with *Ahlborn* simply because they contain "reasonable statutory caps" on recovery from unallocated lump sum settlements. These decisions fail to require a determination of what portion of a settlement is attributable to medical expenses as required by *Ahlborn. See Armstrong*, 722 F.Supp.2d 653; *Andrews*, 669 S.E.2d 310; *Russell*, 23 So.3d 1266; *Scharba*, 2010 WL 1380121.

With this understanding of *Ahlborn*, we now examine the language of W. Va.Code § 9–5–11. In doing so, we find that it, like the Arkansas statute in *Ahlborn*, directly conflicts with the federal anti-lien provision because the statute creates an assignment and a right of subrogation for Medicaid payments, both of which broadly attach to all damages compensated by any settlement, not just recoveries for medical expenses. For example, the assignment provisions of W. Va.Code § 9–5–11(a) provide a right of assignment which attaches to all portions of an applicant's recovery from a third party tortfeasor. It provides, in pertinent part:

(a) *Submission of an application* to the Department of Health and Human Resources for medical assistance *is,* as a matter of law, *an assignment of the right of*

*the applicant* or legal representative thereof *to recovery* from personal insurance or other sources, including, but not limited to, liable third parties, *to the extent of the cost of medical services paid* for by the Medicaid program.

. . .

The department shall be *legally assigned the rights of the recipient* against the person so liable, *but only to the extent of the reasonable value of the medical assistance paid* and attributable to the sickness, injury, disease or disability for which the recipient has received damages. When an action or claim is brought by a medical assistance recipient or by someone on his or her behalf against a third party who may be liable for the injury, disease, disability or death of a medical assistance recipient, *any settlement, judgment or award obtained is subject to the claim of the Department of Health and Human Resources for reimbursement of an amount sufficient to reimburse the department the full amount of benefits paid* on behalf of the recipient under the medical assistance program for the injury, disease, disability or death of the medical assistance recipient.

W. Va.Code § 9–5–11(a) (emphasis added). By their plain wording, these assignment provisions permit the State an assignment

---

avoid settlement manipulation and found that the question of what portion of a settlement was attributable to medical expenses would be submitted to a court; also discussing application of Pennsylvania's Medicaid reimbursement statute amended following *Ahlborn* providing for allocation of the judgment or award between the medical portion and other damages and allowing the department a first lien against the medical portion of the judgment or award); *S.W. Fiduciary v. Health Care Cost Admin.*, 226 Ariz. 404, 249 P.3d 1104, 1109 (App.2011) (Court took *Ahlborn's* warning that 42 U.S.C. § 1396p(a) bars any lien beyond "proceeds designated as payments for medical care," to mean that a Medicaid lien may be enforced only against the portion of the settlement attributable to payments the state plan has made on behalf of the victim. Court noted that when the proper allocation of the settlement amount to the damage component represented by AHCCCS payments is disputed, the better course is to seek the intervention of the court.); *I.P. ex rel. Cardenas v. Henneberry*, 795 F.Supp.2d 1189 (D.Colo.2011) (interpreting Colorado's Medicaid recovery statute to comply with federal

law and concluding that the department's lien was tantamount to a forced assignment of the right to recover that portion of the settlement that represents payment for medical care, which under *Ahlborn*, is consistent with both the third-party liability provisions and the anti-lien provisions in the federal Medicaid statute. Court directed that case proceed to trial to determine what portion of plaintiff's settlement represents those medical expenses); *Price v. Wolford*, 608 F.3d 698, 707–08 (10th Cir.2010) (interpreting Oklahoma Medicaid-recovery statute amended following *Ahlborn* providing a rebuttable presumption which allowed a plaintiff to show "a more limited allocation of damages to medical expenses" by clear and convincing evidence); *State Dep't of Health & Welfare v. Hudelson*, 146 Idaho 439, 196 P.3d 905 (2008) (interpreting Idaho Medicaid recovery statute as creating a procedure for determining a settlement allocation by imposing a rebuttable presumption that an unallocated settlement will be allocated first to past medical expenses. If rebutted through evidence, *Ahlborn* formula may be used to allocate settlement).

for more than what the federal law mandates because the federal law only requires that states obtain an assignment of the medical assistance recipient's *right to recover medical expenses* from liable third parties. However, under our statute, the State's recovery of *the cost of medical expenses paid* is not limited to a recovery only from a recipient's right to recover for medical expenses.

Next, the statute makes clear that DHHR's right of subrogation attaches to any and all damages recovered regardless of type or classification, not just to those that might be allocated to medical expenses. The statute makes it clear that any kind of recovery is subject to the claim of DHHR on a priority basis. *See* Syl. Pt. 2, *Grayam*, 201 W.Va. 444, 498 S.E.2d 12. Specifically, the statute provides, in part, the following:

> [t]he right of subrogation created in this section includes *all portions of the cause of action*, by either settlement, compromise, judgment or award, *notwithstanding any settlement allocation or apportionment that purports to dispose of portions of the cause of action not subject to the subrogation.*

W. Va.Code § 9–5–11(a) (emphasis added).

The statute also imposes a duty on the court to order that the full amount of medical assistance be paid to DHHR, less costs of recovery, including attorney fees and costs. The statute provides:

> (b) ... The trial judge *shall*, upon the entry of judgment on the verdict, *direct that an amount equal to the amount of medical assistance given be withheld and paid* over to the Department of Health and Human Resources.... less the department's share of attorney's fees and costs expended in the matter.

W. Va.Code § 9–5–11(b). The trial judge has no discretion under W. Va.Code § 9–5–11 to allocate damages for medical expenses or to direct the payment of damages to DHHR which have been allocated to medical expenses.

Further, the statute allows DHHR to negotiate with the recipient if DHHR cannot be reimbursed in full out of the settlement proceeds. However, it provides no opportunity for a judicial allocation of damages in settlements containing unstipulated damages. It states that

> [i]n the event of *less than full recovery* the recipient and the department shall agree as to the amount to be paid to the department for its claim ... In the event that a controversy arises concerning the subrogation claims by the department, an attorney *shall interplead*, pursuant to rule twenty-two of the Rules of Civil Procedure, *the portion of the recipient's settlement that will satisfy the department exclusive of attorney's fees and costs* regardless of any contractual arrangement between the client and the attorney.

W. Va.Code § 9–5–11(b) (emphasis added).

Finally, as previously discussed, in *Grayam*, a decision written by this Court prior to *Ahlborn*, we interpreted this language in W. Va.Code § 9–5–11 to provide that if another person is legally liable to pay for medical assistance provided by DHHR, DHHR possesses a priority right to recover full reimbursement from any settlement, compromise, judgment, or award obtained from such other person or from the recipient of such assistance if he or she has been reimbursed by the other person. *Id.*, Syl. Pt. 2, in part.[24] However, based on *Ahlborn*, we conclude that DHHR's attempt to recover from an unallocated lump sum amount under W. Va.Code § 9–5–11 violates the federal anti-lien provision (1) because the assignment giving the State the ability to recover *medical expenses paid* is not limited to a recovery only from a recipient's right to recover for past medical expenses, and (2) because it permits the State to become subrogated for past medical expenses from "all portions" of the cause of action or settlement in this case. Under *Ahlborn*, DHHR may obtain reimbursement for medical expenses paid from only that portion of the settlement, compro-

---

**24.** Again, as provided in footnote 22, *supra*, the most recent amendments made to W. Va.Code § 9–5–11 following the 1995 amendments discussed in *Grayam* and *Anderson*, were effective in 2009. To the extent that we examine the 2009 version of W. Va.Code § 9–5–11, it is noted that the Legislature's 2009 amendments only include language not relevant for purposes of the instant appeal.

mise, judgment, or award obtained by a recipient of Medicaid assistance that constitutes damages for past medical expenses.[25]

In sum, because W. Va.Code § 9–5–11 permits DHHR to obtain an assignment that attaches to the recipient's rights of recovery beyond just a recipient's right to recover for past medical expenses, and because it maintains a right of subrogation which includes "all portions of the cause of action," in situations such as the case *sub judice*, where the settlement does not allocate categories of damages and the parties have not stipulated to categories of damages, we find that W. Va.Code § 9–5–11 conflicts with the provisions of the federal anti-lien statutes, as interpreted by *Ahlborn*.[26]

In a memorandum issued by the Centers for Medicaid and Medicare Services ("CMS") to all Associate Regional Administrators for Medicaid and State Operations following the *Ahlborn* decision, the CMS concluded that statutory language such as that found in W. Va.Code § 9–5–11 necessarily requires revision. The CMS memorandum was issued specifically to aid the states in understanding the effect which the *Ahlborn* decision would have on state third-party liability recovery. *See* Memorandum from Gale Arden, Director of CMS's Center for Medicaid and State Operations Disabled and Elderly Health Programs Group (DEHPG) to all Associate Regional Administrators for Medicaid and State Operations, "State Options for Recovery

**25.** The United States Supreme Court found that the fact that a lien is also called an "assignment" does not alter the analysis. *Ahlborn*, 547 U.S. at 286, 126 S.Ct. at 1764. The Court noted that although denominated an "assignment," the effect of the statute was to impose a lien on Ahlborn's property. Since none of the federal third-party liability provisions excepts that lien from operation of the anti-lien provision, its imposition was found to violate federal law. *Id.* This would likewise be the case here, where DHHR's statutory right of subrogation includes "all portions of the cause of action ... notwithstanding any *settlement* allocation or apportionment that purports to dispose of portions of the cause of action not subject to the subrogation." W. Va. Code § 9–5–11(a). This provision likewise effectively imposes a lien on the respondent's property.

In *Martin v. City of Rochester*, 642 N.W.2d 1 (Minn.2002), the Supreme Court of Minnesota specifically addressed the issue of whether Minnesota's statute, which contained almost identical subrogation language to West Virginia's statute, granted the State a subrogation right that was preempted by federal law. This provision gave the State a subrogation right "to the extent of the cost of medical care furnished" to any rights the medical assistance recipient had under the cause of action arising out of an occurrence that necessitated the payment of medical assistance. *Id.* at 20.

The court found that the subrogation right was not limited to claims for medical expenses as it specifically included "all portions of the cause of action, notwithstanding any settlement allocation." *Id.* The court noted that although the federal anti-lien provision does not explicitly prohibit states from asserting subrogation rights with respect to a medical assistance recipient's cause of action, and thus, compliance with both federal and state laws is not impossible *per se*, the court had to determine, as with the state's separate assignment provision, whether allowing

a subrogation right outside of the state's assigned right to medical expenses would be an obstacle to the purposes of the federal Medicaid scheme. *Id.* The court found that allowing the State to assert a subrogation right and thus get indirectly what it is prohibited from attaining directly would defeat the purpose of the federal anti-lien provision in the same manner as the overly broad assignment rights in Minnesota's statute that the court also found violative of the federal Medicaid scheme. *Id.* The court stated that "[p]ursuing a subrogation right allows an end-run around the protections of the anti-lien provision by using a subrogation right instead of a lien to take part of the recipient's personal property that is protected by the anti-lien provision." *Id.* Thus, the court found that for purposes of its preemption analysis, an assignment of rights to the State and the State's subrogation right are the same. *Id.* Accordingly, the court held the state subrogation provision to be preempted to the extent that it allowed the State to assert a subrogation right against causes of action or settlements for other than medical expenses. *Id.*

**26.** Additionally, when we apply the statute to factual scenarios different than the present case, where the parties *have* stipulated, or a jury verdict or an evidentiary hearing has determined how to allocate the settlement proceeds among medical expenses and other damages, we also find that W. Va.Code § 9–5 –11 conflicts with the provisions of the federal anti-lien statutes, as interpreted by *Ahlborn*. For example, under current West Virginia law, if the recipient obtained a $20,000 jury verdict representing all damages, and DHHR had paid that amount or more to medical providers on the recipient's behalf, DHHR could recover the full $20,000 minus attorneys fees and costs even though the jury had allocated only $10,000 for medical expenses. Such a scenario is precisely what the United States Supreme Court prohibited in *Ahlborn*, 547 U.S. at 278–79, 126 S.Ct. at 1760.

Against Liability Settlements in Light of U.S. Supreme Court Decision in *Arkansas Department of Human Services v. Ahlborn.*" (July 3, 2006) (hereinafter "*CMS Memorandum* "). The CMS Memorandum states that "if a State attempted to recover from more than the portion of a settlement that the parties allocated to medical items and services, it was in violation of the federal anti-lien statute." *Id.* The CMS Memorandum recognized and warned that, "to the extent State laws permit recovery over and above what the parties have appropriately designated as payment for medical items and services, the State was in violation of federal Medicaid laws." *Id.*

Finding the CMS Memorandum provisions illuminating in deciding whether North Carolina's third-party liability statute, N.C. Gen. Stat. §§ 108A–57 and –59 complied with *Ahlborn,* the Fourth Circuit noted the following about the Memorandum's provisions in *Cansler:*

> To aid states in ensuring compliance with *Ahlborn,* the CMS Memorandum listed various actions states may and may not take: (1) states may only require assignment of the right to payment from a third party for healthcare (or medical) items and services; and (2) states may not pass or enforce laws which broaden the recovery rights, vis-a-vis Medicaid beneficiaries, of the state Medicaid agency, allowing such

agencies to recover from damages other than medical expenses provided for in the award amount, even if this means that Medicaid must forego full recovery of its claim. On the other hand, a state may wish to, *inter alia:* (1) "enact laws which provide for a specific allocation amongst damage[s], i.e., pain and suffering, lost wages, and medical claims"; (2) "require that cases can only be compromised with the consent of the state"; (3) "pass laws which require a mandatory joinder of a State when a Medicaid lien is at issue"; (4) "strengthen their laws regarding the duty of attorneys to notify and cooperate to include provisions which could render voidable any settlement of which the State was not notified and given an opportunity to present its recovery claim for medical assistance paid." *Id.* In addition, the CMS Memorandum emphasized the *Ahlborn* Court's admonition that states should become involved in the underlying tort litigation in order to influence the amount that is allocated in a settlement to medical items and services. *Id.*(stating that "absent such involvement, the Court found little sympathy in the State's argument that they should be able to recover the total settlement").

*Cansler,* 674 F.3d at 309 (quoting CMS Memorandum).[27]

---

**27.** The *Cansler* Court also noted that in reaction to the United States Supreme Court's ruling in *Ahlborn,* many states that previously imposed statutory caps on Medicaid third-party recovery amended their laws in various ways. *Cansler,* 674 F.3d at 309–10. Specifically, the Court noted the following:

> Most notably, California changed its laws from imposing a statutory cap of one-half of the recovery to limiting recovery to the portion of the award specifically representing payment for medical expenses or care. Petition for Writ of Certiorari at 20–23, *Brown,* 129 S.Ct. 2792(discussing Cal. Welf. & Inst.Code § 14124.76). Prior to *Ahlborn,* Pennsylvania's third-party liability statute imposed a fifty percent cap on the state's recovery. *Id.* at 23–24 (discussing 62 Pa. Cons.Stat. Ann. § 1409); . . . In the wake of *Ahlborn,* however, the Pennsylvania enacted Pa. Cons.Stat. Ann. § 1409.1, which provides *inter alia* that "the court or agency shall allocate the judgment or award between the medical portion and other damages . . ." Similarly, Oklahoma amended its

statute to provide that the state's lien extends to the entire settlement, after attorneys fees and costs, unless a more limited allocation of damages to medical expenses is shown by clear and convincing evidence. *Brown,* 129 S.Ct. at 2792 (discussing Okla. Stat. Ann. tit. 63, § 5051.1(D)(1)(d))(internal quotation marks omitted). Idaho continues to use its pre-*Ahlborn* statute, which allows for full payment to Medicaid prior to payment of other expenses. *Id.* at 26–27 (discussing Idaho Code Ann. 56–209b(6)). Post-*Ahlborn,* however, this statute has been interpreted to include a rebuttable presumption of such full payment when an allocation is agreed upon by the parties (including the state agency) or is determined through a hearing. *Id.* at 27 (citing *State Dep't of Health & Welfare v. Hudelson,* 146 Idaho 439, 196 P.3d 905, 912 (2008)). States that continue to impose a statutory cap or allow full recovery for Medicaid reimbursements post-*Ahlborn* include Florida, Georgia, Hawaii, Iowa, and North Carolina. (citations omitted). *Id.* at 309–10.

As it applies to W. Va.Code § 9–5–11, the only way for the State to ensure compliance with *Ahlborn* is to provide for a specific allocation of damages in a settlement, compromise, judgment, or award obtained by a recipient of Medicaid assistance. This is indeed the indispensable step which must be taken to ensure that 42 U.S.C. § 1396p, the federal "anti-lien" provision, is not violated. Having concluded that the state Medicaid assignment and subrogation provisions in W. Va.Code § 9–5–11 stand as an obstacle to the accomplishment and execution of congressional objectives and are thus in conflict with federal law, we are now presented with two preemption options. One option is to hold that the state law is preempted entirely. However, because complete preemption is disfavored, we conclude that this statutory provision should be preempted only to the extent that it is in conflict with federal law.[28] Therefore, we hold that W. Va.Code § 9–5–11 is preempted to the extent that its assignment and subrogation provisions conflict with federal law. To the extent that our prior decision in *Grayam v. Department of Health and Human Resources,* 201 W.Va. 444, 498 S.E.2d 12, provided that DHHR possesses a "priority right to recover full reimbursement from any settlement, compromise, judgment, or award obtained from such other person or from the recipient of such assistance if he or she has been reimbursed by the other person," that holding is overruled. In keeping with the United States Supreme Court decision in *Ahlborn,* we conclude that DHHR does not have an absolute priority to recover full reimbursement from any settlement, compromise, judgment, or award obtained. Rather, it maintains a priority right to be paid first out of any damages representing payments for past medical expenses before the recipient can recover any of his or her own costs for medical care. *Ahlborn,* 547 U.S. at 281–82, 126 S.Ct. at 1761–62.

Having established that an allocation must be made that indicates what portion is for past medical expenses as distinct from other damages, we hold that after a settlement, compromise, judgment, or award has been obtained in a Medicaid assistance recipient's claim to recover damages for injuries, disease, or disability, all reasonable efforts should be made to obtain the agreement of DHHR regarding the allocation of that portion thereof that represents the recipient's past medical expenses. No such settlement, compromise, judgment or award shall be consummated or judicially approved, if necessary, until DHHR has been notified and afforded such opportunity to agree to the parties' allocation of damages or to challenge said allocation.[29]

If DHHR and the parties cannot agree on an allocation of damages in a settlement context once DHHR is notified and provided an opportunity to protect its interest, the parties must seek judicial allocation through the court. If judicial allocation becomes necessary, the trial court is required to hold an evidentiary damages hearing, whereupon all parties and DHHR are provided ample notice of the same and are given just opportunity to present the necessary evidence, including fact witness and expert witness testimony, to establish what each contends is an appropriate allocation of damages. In challenging an allocation of damages proposed by the parties, DHHR has the burden of proof to establish a proper allocation. As discussed more fully below, the trial court must necessarily employ certain safeguards to ensure that the allocation of damages is fair and equitable, balancing the interests of the plaintiff recipient, the taxpayers, and the State.

### 5. *Method of Allocating an Unallocated Settlement*

Having established the proper law under *Ahlborn* governing DHHR's recovery of past medical expenses from a recipient's recovery from a third party, we next address how to allocate medical and non-medical damages in an otherwise unallocated settlement, such as in the present case. As set forth above, the

---

28. *See Martin v. City of Rochester,* 642 N.W.2d 1(specifically preempting Minnesota's statutory assignment and subrogation provisions only to the extent that they conflicted with federal law).

29. This holding does not preclude the parties from inviting DHHR to participate in settlement negotiations if they feel it is necessary.

circuit court used the ratio formula set forth in *Ahlborn,* comparing the settlement amount to the total value of the claim. DHHR contends that in cases such as the instant one, where a lump sum settlement is involved, *Ahlborn* does not require a specific method for determining the medical expense portion of the settlement. DHHR takes issue with the application of the *Ahlborn* formula in this case, arguing that it is illogical to assume that simply because a plaintiff settled for a fraction of the supposed "true value" of his claim that this fractional reduction applies uniformly across the various categories of damages. Instead, DHHR contends that W. Va.Code § 9–5–11 provides a reasonable alternative statutory procedure that comports with *Ahlborn.* Specifically DHHR argues that W. Va.Code § 9–5–11 defines the portion of the settlement that is attributable to medical expenses as the amount of medical expenses paid by DHHR on behalf of the Medicaid recipient reduced by DHHR's pro rata share of the Medicaid recipient's attorney's fees and legal costs incurred or a lesser amount in the discretion of the Secretary of DHHR. DHHR points out that in addition to the fact that the Supreme Court discussed that the risk of settlement manipulation can be avoided by the State's advance agreement to an allocation, or if necessary, by submitting the matter to a court for decision, it also went on to say that "some courts have adopted special rules and procedures for allocating tort settlements" under certain circumstances, but ultimately "express[ed] no view on the matter" and "le[ft] open the possibility that such rules and procedures might be employed to meet concerns about settlement manipulation." *Ahlborn,* 547 U.S.

at 288 n. 18, 126 S.Ct. at 1765 n. 18. Thus, DHHR asserts that the Supreme Court left to the States the decision of the measures to employ in the operation of their Medicaid programs.

Holly G. agrees with DHHR that the allocation formula applied in *Ahlborn* is not required to be used in all cases to determine the medical expense portion of a lump sum settlement. However, Holly G. contends that in the instant case, the circuit court properly followed the guidance of the Supreme Court by applying the "ratio" formula used in *Ahlborn.*

 There can be no question that the *Ahlborn* formula is not the only method of allocation to be followed. There is nothing in the *Ahlborn* decision that compels the use of the formula applied in that case. Rather, the formula applied in *Ahlborn* was the result of a stipulation between the parties. The *Ahlborn* court simply sanctioned the use of the formula by equating the stipulation to a judicial determination allocating the award, stating that the effect of the stipulation is the same as if a trial judge had found that Ahlborn's ability to recover on the award of damages was limited in proportion to the percent of contributory negligence determined by the court. *Id.* at 281 n. 10, 126 S.Ct. at 1761 n. 10. While we find that the formula used in *Ahlborn* is not required, it is one rational method of allocation that a court may use with respect to settlements that do not allocate portions of the proceeds to categories of damages. Other courts deciding cases in the wake of *Ahlborn* have also used this method of allocation.[30]

**30.** *See Bolanos v. Superior Court,* 169 Cal. App.4th 744, 87 Cal.Rptr.3d 174, 186 (2008) ("We agree that *Ahlborn* itself does not require the application of the precise formula used in that case, although we do not think this approach, which has the Supreme Court's approval, should be abandoned lightly. We do not agree, however, that *Ahlborn* did not 'consider' the formula—its decision in the case was based on the results of the formula—nor do we agree that *Ahlborn* is of no consequence when it comes to a settlement that has not been allocated between past medical expenses and other damages."); *see also Lima v. Vouis,* 174 Cal.App.4th 242, 94 Cal.Rptr.3d 183, 196 (2009) ("[t]he trial court was required to distinguish past medical

benefits in the settlement from other categories of damage using a rational approach that takes into consideration the trial court's various findings, including its findings concerning the total value of plaintiff's damages and the reasonableness of the settlement amount in light of those total damages."); *Lugo v. Beth Israel Med. Ctr.,* 13 Misc.3d 681, 819 N.Y.S.2d 892, 898 (2006) (court afforded the parties discovery to determine the "true value" of the case and how the settlement should be allocated).

In addition, a Tenth Circuit opinion, *Price v. Wolford,* 608 F.3d 698, 707–08 (10th Cir.2010), offers helpful guidance discussing some considerations a court may undertake when assessing the propriety of a particular lien determination:

Whatever method of allocation is used, what matters is that past medical expenses are distinguished from other damages on the basis of a rational approach. *See Bolanos*, 87 Cal.Rptr.3d 174. As stated above, all reasonable efforts should be made to obtain the agreement of DHHR regarding the allocation of the Medicaid recipient's past medical expenses after a settlement has been obtained. However, if judicial allocation becomes necessary, the trial court is required to hold an evidentiary damages hearing, whereupon DHHR and all parties are provided ample notice of the same and are given just opportunity to present the necessary evidence, including fact witness and expert witness testimony, to establish what each contends is an appropriate allocation of damages.[31] In challenging an allocation of damages proposed by the parties, DHHR has the burden of proof to establish a proper allocation.

■■■■ Upon hearing all of the evidence, the trial court should allocate the settlement between the past medical expenses and other damages in a fair and equitable manner and should allow DHHR a first lien against the past medical expenses portion of the settlement. In order to achieve a fair and equitable allocation, the trial court must conduct a

balancing of the interests of both the plaintiff and DHHR. Settlements should not be permitted to be subject to manipulation by the allocation of funds to only one specific damage category. In determining what portion of a settlement represents payment for past medical expenses and what DHHR's reimbursement should be, the trial court should be guided by the United States Supreme Court decision in *Ahlborn* and other relevant statutory and case law. Finally, for purposes of appeal, the circuit court's decision should be set forth in a detailed order containing the requisite findings of fact and conclusions of law supporting its rulings.[32]

■■■■ As to which post-allocation funds DHHR may reach, Holly G. asserts that DHHR may be reimbursed from only that portion of damages that represents past medical costs. Holly G. argues that DHHR may not be subrogated from damages representing future medical costs. Alternatively, the DHHR contends that the State may seek reimbursement of medical expenses it paid on behalf of a Medicaid recipient from medical expenses recovered by the Medicaid recipient as past and future medical expenses. There is no question that DHHR may only be reimbursed for its past medical expenses.

[A] reduction in a Medicaid lien can be justified only by showing a reason why the plaintiff would agree to allow the defendant to pay less than the full amount of the Medicaid lien. The usual reasons would be that the liability of the settling defendant is uncertain or that the defendant lacks the money to pay for his full liability (or both); so the plaintiff would be willing to take a proportionate reduction in each component of the damages that she would expect the jury to award if the defendant were found liable. For example, if the settlement is for 50% of what the jury is likely to award because there is only a 50% chance that the jury will find liability, the Medicaid lien could properly be cut in half. Or if liability is clear and the expected verdict would be $2 million, but the defendant can pay only $1 million, a 50% reduction would also be in order. A further reduction might also be appropriate if there are doubts about whether the jury would award as damages all the medical expenses paid by Medicaid—because, for example, one could question whether the expenses were caused by the negligent acts of the defendant—although generally one can be more confident of recovering those expenses in full than in recovering, say, the full claim for pain and suffering.

*Id.* at 707–08.

**31.** The instant case merely addresses a settlement and not a judgment. We recognize that a judgment may indeed require a different approach to the extent that some judgments may encompass special verdicts reflecting jury determinations about the actual value of past medical expenses.

**32.** Absent any state-created mechanisms for such allocation, it will fall to the circuit courts of this state to conduct the appropriate proceedings outlined above. As Judge Agee recognized in his dissent in *Cansler*, 674 F.3d at 317,

Until states develop a specific mechanism for determining the medical expense portion of unallocated settlement agreements, a judicial resolution is the only means by which the *Ahlborn* principles for application of a Medicaid lien can be established. The Supreme Court seemed to recognize this point in *Ahlborn* that determining Medicaid lien status on an allocated or unallocated settlement could be "either by obtaining the State's advance agreement to an allocation or, if necessary, by submitting the matter to a court for decision." *Ahlborn*, 547 U.S. at 288, 126 S.Ct. 1752.

Indeed, DHHR is only seeking reimbursement of the medical expenses it paid on Holly G.'s behalf through the date of the settlement with the defendants in the underlying case herein. However, as stated above, DHHR is limited to funds allocated solely to past, not future, medical expenses in seeking reimbursement.

In its decision, the *Ahlborn* court generally stated that "the federal third-party liability provisions *require* an assignment of no more than the right to recover that portion of a settlement that represents payments for medical care." 547 U.S. at 282, 126 S.Ct. at 1762 (emphasis in original). Following *Ahlborn,* various courts addressing this specific issue have come to different conclusions regarding whether states are limited to funds allocated solely to past medical expenses in seeking reimbursement. Some courts have interpreted *Ahlborn* as permitting Medicaid recovery only from settlement proceeds received for past medical expenses, rejecting the argument that the Medicaid lien could be recovered from settlement monies attributable to future medical expenses.[33] Alternatively, other courts interpreting *Ahlborn* have found that the United States Supreme Court made no distinction requiring the states to be limited to funds allocated to past medical expenses.[34]

Given this split of authority among these other jurisdictions on this issue, we find recent guidance provided by the Fourth Circuit helpful in determining which post-allocation funds the DHHR may reach. In *Cansler,* the Fourth Circuit, in determining whether North Carolina's third party liability statutes were in conflict with federal law, construed the *Ahlborn* opinion as limiting a state's recovery to settlement proceeds that are properly allocable to past medical expenses. Specifically, the *Cansler* Court stated,

> As the unanimous *Ahlborn* Court's decision makes clear, federal Medicaid law limits a state's recovery to settlement proceeds that are shown to be *properly allocable to past medical expenses.* In the event of an unallocated lump-sum settlement exceeding the amount of the state's Medicaid expenditures, as in this case, the sum certain allocable to medical expenses must be determined by way of a fair and impartial adversarial procedure that affords the Medicaid beneficiary an opportunity to rebut the statutory presumption in favor of

---

**33.** *See McKinney ex rel. Gage v. Philadelphia Hous. Auth.,* No. 07–4432, 2010 WL 3364400, slip op. at 9 (E.D.Pa. Aug. 24, 2010) (interprets *Ahlborn* as permitting Medicaid recovery from settlement proceeds received for past medical expenses, rejecting argument that the Medicaid lien could be recovered from "settlement monies attributable to future medical expenses"); *Bolanos v. Superior Court,* 169 Cal.App.4th 744, 87 Cal.Rptr.3d 174, 180 (2009) ("The fundamental point is that a settlement that does not distinguish between past medical expenses and other damages must be allocated between these two classes of recoveries. Without such an allocation, the principle set forth in *Ahlborn,* that the state cannot recover for anything other than past medical expenses, cannot be carried into effect."); *Lugo v. Beth Israel Med. Ctr.,* 13 Misc.3d 681, 819 N.Y.S.2d 892, 896 (N.Y.Sup.2006) (finding that "*Ahlborn* must be read to limit the DDS recoupment to the amount of the settlement proceeds allocated to past medical expenses").

**34.** *See In re Matey,* 147 Idaho 604, 213 P.3d 389, 394 (2009) ("The [*Ahlborn*] court made no distinction between damages for past medical care and those for future medical care. Nothing in 42 U.S.C. § 1396p indicates that the State may not seek recovery of its payments from a Medicaid recipient's total award of damages for medical care whether for past, present, or future care.");

*see also I.P. v. Henneberry,* 795 F.Supp.2d 1189, 1197 (D.Colo.2011) ("*Ahlborn* does not require, ... that—in seeking this reimbursement—the Department is limited to funds allocated to past medical expenses. The *Ahlborn* Court made no such distinction.... Because Plaintiff intends on staying on Medicaid, any funds allocated for future medical expenses should rightfully be exposed to the state's lien so that the state can be reimbursed for its past medical payments. Accordingly, the Court concludes that the Department may seek reimbursement for its past medical expenses from funds allocated to 'medical expenses,' regardless of whether those funds are allocated for past or future medical expenses."); *Special Needs Trust for K.C.S. v. Folkemer,* No. 08:10–CV–1077–AW, 2011 WL 1231319, slip op. at 14 (D.Md. March 28, 2011) (finding the observation made by the Idaho Supreme Court in *In re Matey* persuasive, that the Department may satisfy its reimbursement from settlement proceeds allocable as past and future medical expenses, and concluding that the anti-lien and anti-recovery provisions of the Social Security Act do not prohibit the State from recouping expenses it paid on behalf of the Medicaid recipient from settlements that contain unstipulated damage amounts).

the state that allocation of one-third of a lump sum settlement is consistent with the anti-lien provision in federal law. 674 F.3d at 312 (emphasis added). In arriving at this conclusion, the *Cansler* Court stated that *"Ahlborn* is properly understood to prohibit recovery by the state of more than the amount of settlement proceeds representing payment for medical care *already received." Id.* at 307 (emphasis added). To the extent that the Fourth Circuit interprets the *Ahlborn* opinion to limit a state's recovery only to settlement proceeds allocable to past medical expenses and not those proceeds allocable to future medical expenses, we are persuaded that in seeking reimbursement for past medical expenses paid, the DHHR should be limited to funds allocated solely to past medical expenses in seeking reimbursement.[35]

Having decided those fundamental legal issues, we now turn to the specific facts of this case to determine whether the circuit court's allocation using the *Ahlborn* method was appropriate.[36]

### B. Distribution of Net Settlement Proceeds

With respect to this case, DHHR contends that pursuant to W. Va.Code § 9–5–11 and syllabus point 2 of *Grayam,* Holly G. may not receive any settlement proceeds until DHHR has been reimbursed in full. We disagree. As noted above, W. Va.Code § 9–5–11 is preempted to the extent that its assignment and subrogation provisions conflict with *Ahlborn.* Additionally, to the extent that our prior decision in *Grayam* provided that DHHR possesses a "priority right to recover full reimbursement from any settlement, compromise, judgment, or award obtained from such other person or from the recipient

of such assistance if he or she has been reimbursed by the other person," that holding is overruled. In view of the United States Supreme Court decision in *Ahlborn,* DHHR no longer maintains an absolute priority to recover full reimbursement from any settlement, compromise, judgment, or award obtained. Rather, it maintains a priority right to be paid first out of any damages representing payments for past medical care before the recipient can recover any of her own costs for such medical care. *Ahlborn,* 547 U.S. at 282, 126 S.Ct. at 1762.

Since the recipient is obligated to assign only damages representing payments for past medical care, and since federal law prohibits a lien on any part of the recipient's property other than the monies allocated to past medical expenses, no authority exists to prevent the disbursement of other such monies to the plaintiff. To do so would violate *Ahlborn.* In this particular case, we do not find that the circuit court's actions were erroneous in this regard. At the hearing on December 21, 2009, the circuit court ordered that from the total settlement proceeds, the $666,127.07 maximum amount of the two liens asserted by the State of West Virginia and the State of Ohio be placed in escrow pending the court's determination regarding allocation. The circuit court then ordered that the remainder of the settlement funds be used to fund a special needs trust set up for the plaintiff.

### C. Application of Ohio's Statutory Cap on Non–Economic Loss

■ DHHR next contends that the circuit court erroneously applied Ohio Revised Code § 2315.18(B)(3) in assessing the appropriate amount of noneconomic damages in

---

**35.** Additionally, when we review *Ahlborn,* we are also persuaded that the language in *Ahlborn* is more consistent with limiting a state's recovery to settlement proceeds that are allocated to past medical expenses, rather than to proceeds allocated to both past and future medical expenses generally. It is this specific area that will no doubt lead to more litigation in the future. It is our hope that the United States Supreme Court will clarify this issue for the benefit of the states' individual Medicaid programs. Unless and until the United States Supreme Court provides clearer guidance on this issue, this Court is persuaded

by the Fourth Circuit's interpretation of *Ahlborn* provided in *Cansler.*

**36.** In the next assignment of error, DHHR argues that the circuit court's order violates the separation of powers doctrine because pursuant to W. Va.Code § 9–5–11, the Secretary of DHHR has the sole discretion to waive all or part of a West Virginia Medicaid recipient's lien, and thus, the Secretary did not abuse her discretion in this case. Because we find that W. Va.Code § 9–5–11 is not in compliance with *Ahlborn,* we summarily dismiss this argument.

this case.[37] In its order, the circuit court ruled that "Ohio state law applies to E.B.'s calculation of damages" and that "the Court is satisfied that, pursuant to Ohio Revised Statute § 2315.18(b)(3), the Court is free to add its own value, without limitation, as the fact finder in this instance, for E.B.'s non-economic loss." Applying Ohio Revised Code § 2315.18(b)(3), the circuit court found that E.B.'s damages were $5,000,000.

Herein, DHHR argues that Ohio Revised Code § 2315.18(B)(3) only applies to trial courts in Ohio which hear the personal injury action. DHHR maintains that the circuit court in this case was not the "trier of fact in a tort action to recover damages for injury or loss to person or property." Moreover, it also alleges that subsection (F)(1) specifically provides that "[a] court of common pleas has no jurisdiction to enter judgment for noneconomic loss in excess of the limits set forth in this section." In Ohio, the court of common pleas is the court that has jurisdiction over probate matters and infant summary proceedings. See Ohio Const. art. IV, § 4. DHHR asserts that if E.B. was an Ohio resident and the infant summary proceeding was held in the Ohio Common Pleas Court, his non-economic damages would be capped at $350,000.

We disagree with DHHR's contentions for several reasons. First, as the circuit court correctly noted, the underlying action was filed in a federal court in the Southern Dis-

trict of Ohio, and Ohio law was the basis for determining what portion of any judgment or settlement was compensation for medical expenses. *See Miles v. Raymond Corp.,* 612 F.Supp.2d 913, 917 (N.D.Ohio 2009) (district court sitting in diversity jurisdiction applies forum state's choice-of-law rules). The Ohio case, *Morgan v. Biro Mfg. Co.,* 15 Ohio St.3d 339, 474 N.E.2d 286 (1984), sets forth the factors to be considered in determining which state's law should be applied. The court in *Morgan,* 474 N.E.2d at 289, stated:

"When confronted with a choice-of-law issue in a tort action under the Restatement of the Law of Conflicts view, analysis must begin with Section 146. Pursuant to this section, *a presumption is created that the law of the place of the injury controls unless another jurisdiction has a more significant relationship to the lawsuit.* To determine the state with the most significant relationship, a court must then proceed to consider the general principles set forth in Section 145. The factors within this section are: (1) the place of the injury; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties; (4) the place where the relationship between the parties, if any, is located; and (5) any factors under Section 6 which the court may deem relevant to the litigation. All of these factors are to be evaluated according to their relative importance to the case."

**37.** Section 2315.18 of the Ohio Revised Code provides, in part, as follows:

(B) In a tort action to recover damages for injury or loss to person or property, all of the following apply:

(1) There shall not be any limitation on the amount of compensatory damages that represents the economic loss of the person who is awarded the damages in the tort action.

(2) Except as otherwise provided in division (B)(3) of this section, the amount of compensatory damages that represents damages for noneconomic loss that is recoverable in a tort action under this section to recover damages for injury or loss to person or property shall not exceed the greater of two hundred fifty thousand dollars or an amount that is equal to three times the economic loss, as determined by the trier of fact, of the plaintiff in that tort action to a maximum of three hundred fifty thousand dollars for each plaintiff in that tort action or a maximum of five hundred thousand

dollars for each occurrence that is the basis of that tort action.

(3) There shall not be any limitation on the amount of compensatory damages that represents damages for noneconomic loss that is recoverable in a tort action to recover damages for injury or loss to person or property if the noneconomic losses of the plaintiff are for either of the following:

(a) Permanent and substantial physical deformity, loss of use of a limb, or loss of a bodily organ system;

(b) Permanent physical functional injury that permanently prevents the injured person from being able to independently care for self and perform life-sustaining activities.

. . .

(F)(1) A court of common pleas has no jurisdiction to enter judgment on an award of compensatory damages for noneconomic loss in excess of the limits set forth in this section.

. . .

(Emphasis added). Applying the analysis set forth by the Ohio Supreme Court in *Morgan,* the substantive law of the state of Ohio would have applied to the underlying case since the injury occurred in Ohio.

Although the circuit court in this case correctly found that Ohio substantive law should apply to the claims herein, both the parties and the court applied the incorrect statute regarding compensatory damages for noneconomic loss. Section 2315.18, the statute applied by the circuit court, plainly defines the term "tort action" in subsection (A)(7) as follows:

> "Tort action" means a civil action for damages for injury or loss to person or property. "Tort action" includes a civil action upon a product liability claim or an asbestos claim. *"Tort action" does not include a civil action upon a medical claim,* dental claim, optometric claim, or chiropractic claim or a civil action for damages for a breach of contract or another agreement between persons.

R.C. § 2315.18(A)(7) (2003) (emphasis added). Rather, compensatory damages caps for noneconomic loss in medical malpractice actions are governed by Ohio Revised Code § 2323.43, which provides, in pertinent part:

(A) In a *civil action upon a medical,* dental, optometric, or chiropractic *claim to recover damages for injury,* death or loss to person or property, all of the following apply:

(1) There shall not be any limitation on the amount of compensatory damages that represent the economic loss of the person who is awarded the damages in the civil action.

(2) Except as otherwise provided in division (A)(3) of this section, the amount of compensatory damages that represents damages for noneconomic loss that is recoverable in a civil action under this section to recover damages for injury, death, or loss to person or property shall not exceed the greater of two hundred fifty thousand dollars or an amount that is equal to three times the economic loss, as determined by the trier of fact to a maximum of three hundred fifty thousand dollars for each plaintiff or a maximum of five

hundred thousand dollars for each occurrence.

(3) *The amount recoverable for noneconomic loss in a civil action under this section may exceed the amount described in division (A)(2) of this section but shall not exceed five hundred thousand dollars for each plaintiff* or one million dollars for each occurrence if the noneconomic losses of the plaintiff are for either of the following:

(a) Permanent and substantial physical deformity, loss of use of a limb, or loss of a bodily organ system;

(b) *Permanent physical functional injury that permanently prevents the injured person from being able to independently care for self and perform life-sustaining activities.*

. . .

(D)(1) A court of common pleas has no jurisdiction to enter judgment on an award of compensatory damages for noneconomic loss in excess of the limits set forth in this section.

. . .

Operating under the belief that Ohio Revised Code § 2315.18(B)(3) applied to this case, the circuit court incorrectly assumed that it was free to add its own value, without limitation, as the factfinder in this instance, for E.B.'s noneconomic losses. Thus, the circuit court, after considering the substance of Dr. Yarkony's deposition testimony and the guardian *ad litem's* testimony, found that $5,000,000.00 in compensatory damages was a reasonable figure in light of the damages that E.B. had suffered. However, as Ohio Revised Code § 2323.43 provides above, E.B.'s noneconomic losses would be capped at $500,000.00 in this type of action. Accordingly, we reverse the circuit court's finding on this issue and find that a $500,000.00 cap on noneconomic damages would be applicable in this case.

### D. Expert Testimony Regarding Future Medical Expenses

■ In the last assignment of error, DHHR asserts that Dr. Yarkony's opinions regarding future medical expenses were inadmissible under Rules 702 and 703 of the

West Virginia Rules of Evidence, and thus, the circuit court committed clear error in relying on it. Specifically, DHHR maintains that Dr. Yarkony's deposition was taken for discovery purposes and did not address his qualifications as an economic expert. Additionally, DHHR asserts that Dr. Yarkony did not testify to a "reasonable degree of certainty," but rather his estimation of future damages was only a "gross calculation" to a "reasonable probability." DHHR also argues that Dr. Yarkony's estimation of future damages was not reduced to present value, as required by West Virginia and Ohio law. DHHR also maintains that Dr. Yarkony's opinions erroneously rely on alleged billed rates of medical providers, but the actual medical bills and rates from the providers were not put into evidence by plaintiffs. DHHR contends that the Medicaid paid rate is evidence of the reasonable value of the medical services rendered to E.B. and which will be rendered to him in the future. Thus, DHHR asserts that the circuit court's findings regarding the total value of the case were erroneous.

While at first blush we tend to agree with DHHR that Dr. Yarkony's life care plan may in fact contain some unreliable calculations, in particular the fact that the figures were not reduced to present value, we find that most of DHHR's present challenges to this expert testimony were not preserved at the circuit court level. Below, the circuit court gave DHHR three different opportunities to present the same expert admissibility challenges it now makes for the first time on appeal. The record reveals that the circuit court approved the proposed allocation following two separate hearings that had been conducted where both DHHR and Holly G.

had opportunities to present and challenge expert testimony evidence, and following a subsequent written invitation by the circuit court for the parties to present additional evidence to be considered regarding the full value of E.B.'s claim.

At the hearings, the circuit court received evidence of E.B.'s anticipated future medical expenses through the presentation of Dr. Yarkony's deposition testimony and life care plan, and although DHHR had every opportunity to challenge the expert's qualifications and the specific bases for his opinions at that time, it did not do so. In fact, DHHR made none of the challenges to Dr. Yarkony's testimony during those hearings that it makes herein. Subsequent to those hearings, the circuit court then wrote the parties a letter on February 26, 2010, offering the parties yet another opportunity to present additional evidence regarding the full value of E.B.'s claim. However, DHHR again failed to make any challenges regarding Dr. Yarkony's qualifications or mention his failure to reduce the life care plan figures to present value.[38] Thus, because DHHR failed to challenge Dr. Yarkony's qualifications and the specific bases for his opinions below, we find that these alleged errors have not been adequately preserved for appeal. We have previously held that " '[t]his Court will not pass on a nonjurisdictional question which has not been decided by the trial court in the first instance.' Syllabus Point 2, *Sands v. Security Trust Co.*, 143 W.Va. 522, 102 S.E.2d 733 (1958)." Syl. pt. 2, *Duquesne Light Co. v. State Tax Dep't*, 174 W.Va. 506, 327 S.E.2d 683 (1984). *Accord* Syl. pt. 2, *Cameron v. Cameron*, 105 W.Va. 621, 143 S.E. 349 (1928) ("This court will not review questions which

---

**38.** Likewise, DHHR raised none of the objections it makes in the instant appeal in its Motion for Summary Judgment below. In its Motion for Summary Judgment following these hearings, the only objection made by DHHR was its statement that it disagreed that the evidence presented by Holly G. established a value of the case relative to the Medicaid liens. Specifically, DHHR stated that the guardian *ad litem* admitted on cross examination during the November 12, 2009, hearing that the plaintiff's expert, Dr. Yarkony, who estimated the future medical expenses at $19 million, did not consider the impact of collateral sources, such as Medicaid,

when calculating future damages. DHHR noted that E.B. intended to stay on Medicaid for the remainder of his life, and thus, neither Holly G. nor E.B. would pay for any medically necessary Medicaid-covered services. It also noted that Dr. Yarkony stated in his deposition that the biggest expense item in the life care plan is the "one-on-one 24 hour nursing services"; however, E.B. was then receiving nursing services only sixteen hours a day. Thus, for these reasons, DHHR argued that Holly G. had not established, to a degree of reasonable certainty, the value of non-covered medically necessary items and services she plans to seek for E.B.

have not been decided by the lower court."). This is so because

[o]ur general rule ... is that, when nonjurisdictional questions have not been decided at the trial court level and are then first raised before this Court, they will not be considered.... The rationale behind this rule is that when an issue has not been raised below, the facts underlying that issue will not have been developed in such a way so that a disposition can be made.... Moreover, we consider the element of fairness. When a case has proceeded to its ultimate resolution below, it is manifestly unfair for a party to raise new issues [before this Court]. Finally, there is also a need to have the issue refined, developed, and adjudicated by the trial court, so that we may have the benefit of its wisdom.

*Whitlow v. Bd. of Educ. of Kanawha Cnty.,* 190 W.Va. 223, 226, 438 S.E.2d 15, 18 (1993) (citations omitted). *See also Tennant v. Marion Health Care Found., Inc.,* 194 W.Va. 97, 114, 459 S.E.2d 374, 391 (1995) ("[T]he party complaining on appeal of the admission of evidence bears sole responsibility for adequately preserving the record for meaningful appellate review."). Because these issues are not reflected in the record, we decline to consider them on appeal.

■■■ The only challenge that was presented below was the ODJFS's argument that the paid Medicaid rate, rather than the billed rate, should be used as evidence of the reasonable value of the medical services rendered to E.B. and which will be rendered to him in the future, a point on which DHHR did not take much opportunity to elaborate in its motions before the circuit court.[39] Neither the ODJFS nor DHHR cited any case law or statutory law wherein the use of the Medicaid paid rate is required when calculating an injured party's medical expenses.

In addition, neither the ODJFS nor DHHR presented any expert testimony on the issue. Rather, the ODJFS submitted an affidavit from its Medicaid Health Systems Administrator employee, Brooke Trisel, which included a photocopied page from Dr. Yarkony's life care plan containing Trisel's handwritten notes regarding the Medicaid paid rate for the services listed on Dr. Yarkony's life care plan. In its supplemental filing, DHHR presented even less evidence on this issue. DHHR simply attached an affidavit of Pat Miller, Director of the Office of Medicaid Management Information System Operations & Information Technology, and a printed claims billing history for E.B. showing both the amounts billed and paid by Medicaid from the date Holly G. applied for Medicaid coverage in West Virginia to the date of settlement. DHHR explained in its supplemental submission that the billed amount and the paid amount for nursing services in West Virginia is the same ($14.50 per hour), and this rate is substantially lower than the billed rate in Chicago used by Dr. Yarkony ($35 to $45 per hour).

In its order, the circuit court discussed the issue of which rate, paid or billed, should be used to determine the value of E.B.'s future medical expenses. Given the fact that Brooke Trisel was never qualified as an expert, and given the fact that no Ohio case law or statutory law was presented which mandated the use of Medicaid paid rates to calculate the future medical costs of an injured party in this type of situation, the circuit court could not conclude as a matter of law that the paid rate should be used. While we disagree with the circuit court and find that the holding in *Bates* (finding that both the original medical bill and the amount actually paid are admissible to prove the reasonableness of medical expenses) could be at least instructive in this particular case in the con-

---

**39.** The Ohio Attorney General cited the case *Robinson v. Bates,* 112 Ohio St.3d 17, 857 N.E.2d 1195 (2006), as authority for the proposition that the Medicaid paid rates should be used to calculate the future medical costs for E.B. *Bates* holds that "[b]oth an original medical bill rendered and the amount accepted as full payment are admissible to prove the reasonableness and necessity of charges rendered for medical and hospital care." *Bates,* 857 N.E.2d 1195, at Syl. Pt. 1

(citing *Wagner v. McDaniels,* 9 Ohio St.3d 184, 459 N.E.2d 561 (1984)). However, the court found that this case simply related the ways in which a plaintiff may prove the medical costs he or she has incurred because of the tortious activity of a third party and the ways in which a defendant may defend against such claims. The circuit court found that *Bates* did not talk about the use of the Medicaid rate in the calculation of future medical costs in cases such as this one.

text of assessing future medical expense damages, the fact still remains that no expert testimony was presented by DHHR adequately establishing the paid Medicaid rates applicable to the future medical expenses listed in Dr. Yarkony's plan. Thus, we conclude that the circuit court did not err in refusing to use the paid Medicaid rates in assessing the total value of E. B.'s future medical expenses.

## IV.

## CONCLUSION

As a condition for receiving medical assistance from DHHR, Holly G. assigned to the state only her right to recover medical expenses from those responsible for E.B.'s injuries. Thus, as federal law makes clear pursuant to *Ahlborn*, Holly G. maintained ownership of any remaining rights of recovery, i.e., pain and suffering, emotional distress, disability, disfigurement, loss of earnings, and loss of earning capacity. In this particular case, the settlement did not contain a stipulation of damages. Accordingly, the circuit court conducted an allocation of damages to discern which part of the settlement proceeds constituted recovery for medical expenses.

After the circuit court conducted two separate hearings and allowed the parties a subsequent opportunity to present evidence of the damages sustained by E.B., it then applied the formula utilized in *Ahlborn* to determine that the full value of E.B.'s claim was $25,373937.95.[40] Using this figure, the circuit court determined that DHHR was entitled to $79,040.82.[41] However, as Ohio Revised Code § 2323.43 provides above, E.B.'s noneconomic losses would be capped at $500,000.00 in this type of action. Accordingly, we reverse the circuit court's finding on this issue and find that a $500,000.00 cap on noneconomic damages would be applicable in this case.

Under the formula applied in *Ahlborn*, using the circuit court's factual findings but also including the factors noted above, we find that 17.246386% of the full value of the case is allocable to past medical expenses.[42] Therefore, the DHHR is entitled to approximately $96,080.43, less its pro rata share of attorney's fees and costs. To the extent that the circuit court failed to make a deduction for DHHR's pro rata share of attorney's fees and costs as required by W. Va.Code § 9–5–11(b)[43] following its initial allocation of damages below, we remand this matter to the circuit court for entry of an order consistent with this opinion.[44]

---

**40.** This figure includes $19,118,608.00 for future medical costs (based on Dr. Yarkony's lowest projected figure and assumes E.B. will only live to fifty years of age), $1,255,329.95 in lien monies asserted by DHHR and the ODJFS, and $5,000,000.00 in noneconomic damages.

**41.** The circuit court found that the proposed settlement was $3,600,000.00. Thus, $3,600,000.00/$25,373,937.95 = 0.141877859364750279 × 100 = approximately 14.1878%. 14.1878% of DHHR's total reimbursement of $557,104.71 is $79,053.16.

**42.** Amount of settlement is $3,600,000.00. Assuming a statutory cap of $500,000.00 for noneconomic damages is applied, then the full value of the case is $20,873,937.95 [$19,118,608 in future medical expenses based on Dr. Yarkony's life care plan + $1,255,329.95 in past medical expenses paid by DHHR and ODJFS = $20,373,937.95 + $500,000.00 noneconomic damages cap]. The settlement amount of $3,600,000.00/full value of the case $20,873,937.95 = 0.17246386 × 100 = 17.246386%. Therefore, the DHHR is entitled to $96,080.43 [$557,104.71

× 0.17246386 = approximately $96,080.430], less its pro rata share of attorney's fees and costs.

**43.** Pursuant to W. Va.Code § 9–5–11(b),

from the amount required to be paid to the Department of Health and Human Resources there shall be deducted the attorney fees attributable to such amount in accordance with and in proportion to the fee arrangement made between the recipient and his or her attorney of record so that the department shall bear the pro rata portion of such attorney fees.

*See also* Syl. Pt. 1, in part, *Anderson v. Wood*, 204 W.Va. 558, 514 S.E.2d 408 ("[O]nce the Department enforces its subrogation rights provided by W. Va.Code § 9–5–11(b), it becomes liable to·the individual for its pro rata share of the costs and attorney's fees incurred by the individual in recovering his/her medical expenses....").

**44.** In accordance with this opinion, following the circuit court's deduction for applicable attorney's fees and costs, DHHR should be reimbursed before the funds allocated to past medical care are placed into a special needs trust account.

Accordingly, the July 16, 2010, order of the Circuit Court of Hancock County is affirmed in part, reversed in part, and remanded with directions.

**Affirmed in part, reversed in part, and remanded.**

Chief Justice KETCHUM dissents and reserves the right to file a dissenting opinion.

Justice DAVIS concurs and reserves the right to file a concurring opinion.

Justice WORKMAN concurs and dissents and reserves the right to file a separate opinion.

DAVIS, Justice, concurring:

The majority opinion in this case is a thorough, well-reasoned, and comprehensive compendium of this Court's jurisprudence regarding DHHR's statutory right, afforded by W. Va.Code § 9–5–11 (2009) (Supp.2011),[1] to recover monies it has paid for a Medicaid recipient's medical expenses. I write separately to reiterate my agreement with the majority's recognition that DHHR's recovery pursuant to W. Va.Code § 9–5–11 is limited to that portion of a Medicaid recipient's damages award that is allocated to, or specified as payment for, his/her past medical expenses only. Unquestionably, the seminal case on this point, *Arkansas Department of Health and Human Services v. Ahlborn*, 547 U.S. 268, 126 S.Ct. 1752, 164 L.Ed.2d 459 (2006), remains silent as to whether a recovery of previously paid Medicaid benefits attaches only to the recipient's damages award for past medical expenses or whether reimbursement also may be sought from the recipient's future medical damages award, referring only to "medical expenses," generally, without distinction between past and future medical expenses. *See Ahlborn*, 547 U.S. at 291, 126 S.Ct. at 1766, 164 L.Ed.2d 459 (citation omitted). Whether the Supreme Court intentionally or astutely failed to resolve this quandary remains to be seen, although the most logical explanation is that the Court simply did not need to reach this issue insofar as the parties therein had agreed that the Medicaid payor's recovery would be limited to that portion of the Medicaid recipient's settlement proceeds that "constituted reimbursement for medical payments made." *See* 547 U.S. at 274, 126 S.Ct. at 1758, 164 L.Ed.2d 459 (citation omitted).

Nevertheless, this absence of a definitive ruling inevitably has led to a difference of opinion regarding the source of a Medicaid payor's recovery: whether the recovery source is limited to *past* medical damages *only* or whether *both* past *and* future medical damages are available to satisfy the payor's previously paid expenses. The dissenters favor attaching that portion of the recipient's damages award representing his/her future medical expenses that is intended to provide the recipient financial security and ensure that he/she will have sufficient resources to continue receiving necessary medical care. By contrast, the majority of the Court, as we consistently have done in our prior opinions, resolves this issue by consulting the other courts who have carefully considered and answered this question. The *majority* view in the country, with which the majority of this Court agrees, permits a Medicaid payor to recover benefits it previously has paid on

---

1. The text of W. Va.Code § 9–5–11 (2009) (Supp. 2011) begins, in subsection (a), with

 *[s]ubmission of an application to the Department of Health and Human Resources for medical assistance is*, as a matter of law, *an assignment of the right* of the applicant or legal representative thereof *to recovery* from personal insurance or other sources, including, but not limited to, liable third parties, to the extent of *the cost of medical services paid for by the Medicaid program*.

 (Emphasis added). From this language, it is apparent that the DHHR's recovery rights arise upon a potential Medicaid recipient's application for benefits. As such, the version of this statute that governs the claims in the case *sub judice* is the version that was in effect at the time that Holly G. applied for benefits on behalf of E.B. on February 5, 2007, which would be the 1995 version of this statute. *See* W. Va.Code § 9–5–11 (1995) (Repl.Vol.2007). Nevertheless, the majority opinion in this case cites to the current version of this statute. *See* W. Va.Code § 9–5–11 (2009) (Supp.2011). Because the changes between these two statutory versions are primarily stylistic and do not affect the substance of those provisions upon which the Court's decision of this case is based, my separate opinion also will refer to the 2009 version of W. Va.Code § 9–5–11 to maintain consistency with the majority's citations to this statute.

behalf of a Medicaid recipient from that portion of the recipient's damages award representing his/her *past* medical expenses *only*. *See, e.g., E.M.A. v. Cansler,* 674 F.3d 290 (4th Cir.2012); *McKinney v. Philadelphia Hous. Auth.,* No. 07–4432, 2010 WL 3364400 (E.D.Pa. Aug. 24, 2010); *Price v. Wolford,* No. CIV–07–1076–M, 2008 WL 4722977 (W.D.Okla. Oct. 23, 2008); *Branson v. Sharp Healthcare, Inc.,* 193 Cal.App.4th 1467, 123 Cal.Rptr.3d 462 (2011); *Garcon v. Agency for Health Care Admin.,* No. 3D11–925, 2012 WL 2120870 (Fla.Dist.Ct.App. June 13, 2012); *Lugo v. Beth Israel Med. Ctr.,* 13 Misc.3d 681, 819 N.Y.S.2d 892 (N.Y.Sup.Ct. 2006); *Doe v. Vermont Office of Health Access,* No. 2011–045, 2012 WL 752727 (Vt. Mar. 9, 2012). The view espoused by the dissenting members of this Court is the country's *minority* view, which permits the attachment of *both* past *and* future medical damages awarded to the Medicaid recipient. *See, e.g., I.P. v. Henneberry,* 795 F.Supp.2d 1189 (D.Colo.2011); *Special Needs Trust for K.C.S. v. Folkemer,* No. 08:10–CV–1077–AW, 2011 WL 1231319 (D.Md. Mar. 28, 2011); *In the Matter of Matey v. Matey,* 147 Idaho 604, 213 P.3d 389 (2009).

I agree with the soundness of the legal reasoning supporting the decisions of a majority of the courts in the country, which this Court's majority has adopted in its decision of this case: the recovery of previously paid Medicaid expenses is limited to the recipient's damages award for his/her *past* medical expenses. Accordingly, I respectfully concur with the majority's opinion in this case.

KETCHUM, C.J., dissenting:

I disagree with the majority's conclusion that West Virginia taxpayers can only be reimbursed from the pro rata portion of the plaintiff's settlement representing past medical expenses. As a result, West Virginia will only be reimbursed 17.24% of the $557,104.71 ($96,080.43) that DHHR paid on the plaintiff's medical bills. If West Virginia had been allowed to be reimbursed from that

portion of the plaintiff's settlement representing damages for *all* medical expenses, past and future, it would have been reimbursed all of the $557,104.71 it paid on plaintiff's medical bills.

The majority's holding is the result of an erroneous reading of the United States Supreme Court's seminal case on this issue, known as *Ahlborn*.[1] Contrary to the conclusion reached in the majority opinion, *Ahlborn* clearly held that West Virginia can be reimbursed from any part of a settlement representing damages for medical expenses, past and future.[2] The Supreme Court in Ahlborn made no distinction between settlement damages for past medical care and those for future medical care. In addition, nothing in the Medicaid statutes indicate that the State may not seek reimbursement for medical bills it paid, for a Medicaid recipient, from the total settlement damages for medical care whether past, present, or future care.[3]

As a result of the majority holding, West Virginia's taxpayers will not be reimbursed for the millions of dollars a year it pays on the medical bills of Medicaid recipients. Settlements paid by insurance companies to Medicaid recipients will be kept by the recipients and West Virginia will keep paying their medical bills.

In this case, the plaintiff's part of the settlement money was placed in a "special needs trust." Under Medicaid law this money cannot be counted as an asset of the plaintiff when determining Medicaid eligibility.[4] Therefore, West Virginia's taxpayers will be paying, through Medicaid, plaintiff's future medical bills that will total more than $19 million dollars. The plaintiff will be able to use the millions put in the special needs trust as a supplement to enhance quality of life.

## WEST VIRGINIA IS LOSING MILLIONS—THE LEGISLATURE MUST ACT

Six years ago, *Ahlborn* instructed that state legislatures can enact laws to enhance

1. *Arkansas Department of Health and Human Services v. Ahlborn,* 547 U.S. 268, 126 S.Ct. 1752, 164 L.Ed.2d 459 (2006).

2. *Id.,* 547 U.S. at 281, 126 S.Ct. 1752.

3. *See,* 42 U.S.C. 1396p [2009]; *In re Matey,* 147 Idaho 604, 213 P.3d 389 (2009).

4. 42 U.S.C. 1396p(d)(4)(A).

the reimbursement of Medicaid expenditures. It is a known fact that many settlements, where Medicaid has paid the plaintiff's medical bills, are not reported, not paid, and not aggressively pursued by the State. The Federal Government had a similar problem obtaining reimbursement for plaintiff's bills paid under Medicare. Congress took action to fortify Medicare's reimbursement efforts by passing the Medicare, Medicaid, and SCHIP Extension Act of 2007.[5] Under that Act, liability insurance carriers and lawyers *must* report claims where Medicare paid the medical bills or be subject to fines up to $1,000 per day and suits seeking double damages. Our Legislature needs to promptly enact similar reporting and payment requirements for Medicaid.[6] Lawyers representing parties, and liability insurance companies, should be required to report claims and settlements and make sure that West Virginia is reimbursed for its Medicaid expenses. Our statutes should provide for substantial penalties for the failure to comply.

The majority opinion discussed other state laws that may be enacted to strengthen Medicaid reimbursement. I believe the Legislature should seriously consider these options: (1) enact a law which provides for a specific allocation amongst damages, *i.e.*, pain and suffering, lost wages, and medical claims, (2) enact a law that requires that cases can only be compromised with the consent of the State, (3) enact a law which requires the mandatory joinder of the State when a Medicaid lien is at issue, and (4) enact a law strengthening the duty of attorneys to notify and cooperate, to include provisions which could render voidable any settlement of which the State was not notified and given an opportunity to present its recovery claim for medical assistance paid.[7]

For the foregoing reasons, I respectfully dissent and urge the Legislature to act in order to save West Virginia's taxpayers millions of dollars a year.

WORKMAN, Justice, concurring, in part, and dissenting, in part:

I concur with the majority's conclusion that W. Va.Code § 9-5-11 (2009) is preempted to the extent that it conflicts with *Arkansas Department of Health and Human Services v. Ahlborn,* 547 U.S. 268, 126 S.Ct. 1752, 164 L.Ed.2d 459 (2006), and further that our holding in *Grayam v. Department of Health and Human Resources,* 201 W.Va. 444, 498 S.E.2d 12 (1997), granting the Department of Health and Human Resources (hereinafter "DHHR") a "priority right to recover full reimbursement" must be overruled. Moreover, I agree that, to comply with the United States Supreme Court's holdings in *Ahlborn* and the anti-lien provisions of the Medicaid Act, 42 U.S.C. §§ 1396a(a)(18) and 1396p, a settlement or judgment must be allocated among the various categories of damages to ensure that DHHR's reimbursement does not encroach upon any aspects of the settlement or judgment which constitute the "property" of a Medicaid recipient. However, I disagree with the majority's determination that *Ahlborn* precludes recovery of a Medicaid subrogation lien from that portion of the settlement or judgment which constitutes future medical expenses. Additionally, I believe that the means and methods established by the majority to effectuate settlement and allocation in cases involving Medicaid liens are under-developed and impracticable. Finally, I believe that our Legislature should consider this issue and establish fair, efficient, and workable procedures to ensure that *Ahlborn*

5. 42 U.S.C. 1395y. *See also,* Tamela White, "The Medicare Secondary Payer Act and Section 111 of the Medicare, Medicaid, SCHIP Extension Act of 2007: Implications for Claim Management and Resolution for Liability Insurance Plans," 77 *Defense Counsel Journal* 180 (April 2010).

6. *See,* 42 U.S.C. 1395y(b)(8)(E); *U.S. v. Harris,* 2009 WL 891931 (N.D.W.Va.2009) (finding plaintiff's attorney individually liable for reimbursing Medicare because the government can recover "from any entity that has received pay-

ment from a primary plan," including an attorney.).

7. *See,* Memorandum from Gale Arden, Director of CMS's Center for Medicaid and State Operations Disable and Elderly Health Programs Group (DEHPG) to all Associate Regional Administrators for Medicaid and State Operations, "State Options for Recovery Against Liability Settlements in Light of U.S. Supreme Court Decision in *Arkansas Department of Human Services v. Ahlborn* " (July 3, 2006).

is being effectuated in a manner which is equitable and balances the rights and needs of the Medicaid recipient, DHHR, and ultimately the taxpayers.

## A.

### Reimbursement from Future Medical Expenses

Inasmuch as the majority opinion sets forth an exhaustive examination of the Medicaid Act, *Ahlborn,* and our applicable statutes, further discussion of the general principles contained therein is unnecessary. However, further examination of *Ahlborn* and the Fourth Circuit's treatment thereof in *E.M.A. ex rel. Plyler v. Cansler,* 674 F.3d 290 (2012), demonstrates the overly restrictive reading the majority undertakes to preclude DHHR from obtaining reimbursement from amounts allocated to future medical expenses. As the majority implicitly acknowledges, the language in *Ahlborn* in no way limits Medicaid's recovery to amounts allocated to *past* medical expenses. In fact, the language utilized by the Supreme Court appears very intentionally broad: "[W]hat § 1396k(b) requires is that the State be paid first out of *any damages representing payments for medical care* before the recipient can recover any of her own costs for medical care." *Ahlborn,* 547 U.S. at 282, 126 S.Ct. 1752 (emphasis added). "[T]he federal third-party liability provisions *require* an assignment of no more than the right to recover that portion of a settlement that represents payments for *medical care.*" *Id.* (second emphasis added). "Ahlborn retained the right to sue for *medical care payments,* and the State asserted a right to the fruits of that suit once they materialized." *Id.* at 286, 126 S.Ct. 1752 (emphasis added). "[§ 1396k(b) ] gives the State a priority disbursement from the *medical expenses* portion alone." *Id.* at 291, 126 S.Ct. 1752 (emphasis added). Had the Supreme Court intended to restrict recovery to amounts allocated to past medical expenses it easily could have done so. Other courts take a similar view. *See In re Matey,* 147 Idaho 604, 213 P.3d 389 (2009); *Special Needs Trust for K.C.S. v. Folkemer,* 2011 WL 1231319 (D.Md. Mar. 28, 2011); *Perez*

*ex rel. Cardenas v. Henneberry,* 2011 WL 1584105 (D.Colo. Apr. 26, 2011).

Recognizing the dearth of guidance on this issue in *Ahlborn,* the majority looks to the Fourth Circuit case of *E.M.A. ex rel. Plyler v. Cansler, supra,* for persuasive authority. In *Cansler,* the Fourth Circuit found that North Carolina's third-party liability statutes, which allowed recovery of the lesser of actual Medicaid subrogation lien or one-third of the total recovery, failed to comply with *Ahlborn.* In its summary paragraph, the Fourth Circuit states that "federal Medicaid law limits a state's recovery to settlement proceeds that are shown to be properly allocable to *past* medical expenses." *Id.* at 312 (emphasis added). This statement notwithstanding, at no point in the Fourth Circuit's opinion does it analyze or even cursorily address the issue of whether reimbursement of past medical expenses may be made from that portion of the settlement representing future expenses. The majority further cites to the only other vague reference to past medical expenses contained in *Cansler:* "*Ahlborn* is properly understood to prohibit recovery by the state of more than the amount of settlement proceeds representing payment for medical care *already received.*" *Id.* at 307 (emphasis added). Again, however, the majority cherry-picks this statement out of a discussion having nothing whatsoever to do with the issue for which it is cited. This statement from *Cansler* is contained within a discussion finding that the North Carolina Supreme Court's conclusion that *Ahlborn* did not apply to non-allocated, lump-sum settlements was erroneous. Again, at no point is the instant issue directly discussed or analyzed.

In fairness to the majority, it notes that this issue will undoubtedly spawn further litigation and requests further guidance from the United States Supreme Court. However, I believe that not only is this Court not constrained by the Fourth Circuit's dicta which only tangentially makes reference to past medical expenses, but that the broad language of *Ahlborn,* which contains no such easily designated restriction to *past* medical expenses, permits this Court to allow such a recovery.

Being of the opinion that *Ahlborn* does not preclude the DHHR from recovering its subrogation lien for past medical expenses from the future expenses portion of a settlement or judgment, I do not believe, however, that such recovery should be permitted in every instance. Rather, I believe the policy reasons behind permitting such a recovery dictate that it should be permitted only in cases where a Special Needs Trust is established for the benefit of the Medicaid recipient. Special Needs Trusts were created by Congress in 1993 in an amendment to the statute governing federal Medicaid grants to states. *See* 42 U.S.C. § 1396p(d)(4)(A). The statute generally provides that assets in a trust are to be considered in determining an individual's eligibility for, or amount of, benefits under a state Medicaid plan. 42 U.S.C. § 1396p(d)(1). However, certain types of trusts are exempted. Subsection (4) provides:

> (A) A trust containing the assets of an individual under age 65 who is disabled (as defined in section 1382c(a)(3) of this title) and which is established for the benefit of such individual by a parent, grandparent, legal guardian of the individual, or a court if the State will receive all amounts remaining in the trust upon the death of such individual up to an amount equal to the total medical assistance paid on behalf of the individual under a State plan under this subchapter.

*Id.* at § 1396p(d)(4)(A). As explained by the 8th Circuit Court of Appeals:

> [42 U.S.C.A. 1396p(d)(4)(A) ] provides that disabled persons under the age of 65 remain eligible for ongoing Medicaid assistance (MA) in spite of funds or other property held in an SNT ["Special Needs Trust"], and can use SNT funds as a supplement to enhance the quality of their lives. The disabled person remains eligible for MA so long as the SNT contains a pay-back trust provision, *i.e.* a provision specifying that the total MA provided on or after October 1, 1993, will be paid back to the state after the beneficiaries' death from any funds remaining in the trust.

*Norwest Bank of North Dakota, N.A. v. Doth,* 159 F.3d 328, 330 (1998). As the 8th

Circuit noted, however, "[n]othing in the statute requires the trustee to preserve the State's interest in the trust corpus." *Id.* at 332. As such, despite the condition that the trust residual be utilized to reimburse Medicaid upon death of the beneficiary, there is no guarantee that there will be funds remaining in the trust with which to reimburse Medicaid.

Given that the purpose of establishing a Special Needs Trust is to preserve the Medicaid recipient's ability to continue to be eligible for Medicaid—which will then pay the recipient's future medical bills—the recovery of future medical expenses in a settlement or judgment creates a double recovery for the Medicaid recipient. The recipient may recover future expenses, pocket them in a Special Needs Trust, and still receive payment for the bulk of any future medical expenses from Medicaid. The reality is that DHHR will never be fully reimbursed for all that it will ultimately expend during the lifetime of an injured recipient as a proximate result of that injury. Allowing DHHR to recoup as much of the past expenses it has incurred on behalf of an injured recipient as possible, at a time when reimbursement is the most likely to occur—upon settlement of an injury claim or lawsuit—appears equitable in situations where a Special Needs Trust is established. Further, any severely injured individual would also qualify for Social Security income and benefits.

### B.

*Settlement and Allocation of Cases Involving Medicaid Liens*

After determining that W. Va.Code § 9–5–11 and *Grayam* run afoul of *Ahlborn,* the majority proceeds to establish a post-settlement exchange between the parties and DHHR designed to facilitate allocation by agreement and the framework of a generic judicial allocation procedure to be utilized when an agreement cannot be reached. While I am cognizant of the difficult task of fashioning procedures to be utilized to give effect to the Supreme Court's holding in *Ahlborn,* I respectfully suggest that those established by the majority are more likely to frustrate settlement efforts and create a

nearly-impossible burden for the DHHR to meaningfully fulfill its statutory obligation to pursue recovery of its subrogation lien.

First, the majority establishes a post-settlement requirement for the parties and DHHR to engage in a dialogue, making "all reasonable efforts" to reach an agreement on allocation. The clear implication of the syllabus point encompassing this dialogue is that the parties are to resolve the case without active involvement of DHHR as pertains to recovery of its lien and then attempt to create a *post-hoc* allocation that satisfies the DHHR while preserving inviolate the competing interests and concerns of the parties which must be accommodated in reaching the settlement. Rather than facilitating settlement, I believe this will potentially frustrate settlement efforts.

While the majority half-heartedly notes that the parties are not precluded from inviting DHHR to participate in settlement negotiations if "necessary," I believe that its active involvement can only better enable both the parties and DHHR to reach a compromise which is fair and satisfactory to all. As most practitioners can attest, considerations in reaching a final settlement necessarily include determining what amounts will be deducted from any gross settlement for attorney fees, costs, and liens. The injured party is less interested in the gross settlement amount than the net settlement which they will have at their disposal; without having any information about the range in which the ultimate lien pay-out will lie, it will be difficult to convey to the injured party any sense of a "guaranteed" range of net recovery. If the parties and DHHR cannot agree on an allocation, obviously the net recovery will still be unknown, but with an exchange of proposed allocations during the settlement process, the injured party can at least know a range within which his net settlement will fall.

Moreover, engaging in this negotiation regarding the allocation while settlement discussions are occurring will allow an opportunity for a greater overall compromise and a more equitable, cost-effective result. For example, if all that stands in the way of reaching a final settlement amount is the DHHR lien, knowing precisely the difference in the amount DHHR and the parties propose for allocation will allow for compromise of this amount by all participants in the negotiation and aid in reaching settlement. It will also necessarily allow the parties to determine if a refusal to agree to an allocation is in their best interest and whether proceeding to judicial allocation will be cost effective. Only if both of these negotiations—both settlement amount between plaintiff and defendant(s) and lien amount between plaintiff and DHHR—are contemporaneous can a true compromise occur. Relegating lien negotiations to a post-settlement phase, as the majority suggests, could create unequal bargaining positions. Settlement negotiations are fluid and without the presence of all of the "moving parts" at mediation or during negotiations, resolution efforts are frequently frustrated.

If DHHR were permitted at its discretion to participate in settlement negotiations or a mediation, the exchange of information about the strengths and weaknesses of the case which necessarily shape and mold the ultimate settlement could obviously be fully considered by DHHR and the parties, jointly, in development of an allocation. However, this right to participate triggers a commensurate obligation of DHHR to provide prompt information regarding lien amounts and, during the course of settlement negotiations, its proposed allocation, for use by the parties in crafting a settlement. To effect this joint resolution effort, DHHR should be given ample notice of and the right to participate in settlement negotiations or mediation, and DHHR must provide full information on its expenditures.

These considerations are inextricably intertwined with my concerns regarding the majority's holding that DHHR is to bear the burden of proof in any judicial allocation procedure. Under Syllabus Point 8, the majority sets the stage for judicial allocation proceedings where an agreement cannot be reached between the parties and DHHR. In so doing, the majority creates a presumption that where agreement cannot be reached, DHHR is cast as the "challenger" to the allocation and bears the commensurate bur-

den of proof. I believe this creates an unfair burden on DHHR and increases the potential for allocation manipulation by the parties, all at the expense of DHHR and ultimately the taxpayers.

The Tenth Circuit, in describing the issues of proof which are central to an adversarial allocation proceeding, highlights the practical impossibility of the majority's burden of proof. In *Price v. Wolford,* 608 F.3d 698 (10th Cir.2010), the court considered the propriety of a judicial allocation pursuant to Oklahoma's amended Medicaid recovery statute, Okla. Stat. tit. 63, § 5051.1(D). Oklahoma's statute, which was amended post-*Ahlborn,* establishes that the Oklahoma Health Care Authority shall have a lien in the amount paid under Medicaid "up to the amount of the damages for the total medical expenses" and that such lien shall be considered valid "unless a more limited allocation of damages to medical expenses is shown by clear and convincing evidence." Okla. Stat. tit. 63, § 5051.1(D)(1)(d). The Health Care Authority argued that the parties did not meet their burden of establishing a more limited allocation by clear and convincing evidence because they quite simply offered no evidence to justify the allocation. *Price,* 608 F.3d at 707. In discussing the sufficiency of the evidence presented to justify the allocation, the court explained that

> Aside from a reduction necessary to compensate counsel, a reduction in a Medicaid lien can be justified only by showing a reason why the plaintiff would agree to allow the defendant to pay less than the full amount of the Medicaid lien. The usual reasons would be that the liability of the settling defendant is uncertain or that the defendant lacks the money to pay for his full liability (or both); so the plaintiff would be willing to take a proportionate reduction in each component of the damages that she would expect the jury to award if the defendant were found liable. For example, if the settlement is for 50% of what the jury is likely to award because there is only a 50% chance that the jury will find liability, the Medicaid lien could properly be cut in half. Or if liability is clear and the expected verdict would be $2 million, but the defendant can pay only $1 million, a 50% reduction would also be in order. A further reduction might also be appropriate if there are doubts about whether the jury would award as damages all the medical expenses paid by Medicaid—because, for example, one could question whether the expenses were caused by the negligent acts of the defendant—although generally one can be more confident of recovering those expenses in full than in recovering, say, the full claim for pain and suffering.

*Id.* at 707–08. The Tenth Circuit appropriately recognized what are surely the most common reasons a compromised settlement occurs: unclear liability, insufficient assets, and damages issues, including questions of causation. In addition, unsupported or over-inflated future damages may unfairly skew a proportionate approach to allocation, i.e., over-inflated future damages exaggerate the "full value" of the case, making it appear that the injured party settled for a smaller fraction of its value than is accurate, thereby driving down the proportionate share of the Medicaid lien. While Oklahoma's statute puts the burden on the Medicaid recipient as opposed to the State, whether a reduced lien amount is "challenged" by the State or "justified" by the injured party, the potential reasons for reduction of the Medicaid lien are the same. Identifying the issues which will be the subject of the adversarial judicial allocation hearing merely underscores the inequity of placing the burden of proof on DHHR.

Inasmuch as DHHR is a stranger to the claim or litigation being compromised in settlement, it is unclear how the majority anticipates DHHR having sufficient information to meet its burden at a judicial allocation hearing. As a non-party, the parties have no obligation to provide discovery materials to DHHR which would illuminate liability or damages issues affecting settlement value. Moreover, as a non-party, DHHR has no opportunity to develop evidence of its own to support its position regarding allocation. Simply summarily providing DHHR with the *opportunity* to "present the necessary evidence, including fact witness and expert witness testimony," as the majority states, does

not enable DHHR to have the practical *ability* to proffer evidence in support of its burden of proof or to challenge evidence with which it disagrees. Although ostensibly DHHR could hire an expert witness to opine on certain matters—most likely damages-related—without complete information including testimony of treating physicians, medical records, or other expert reports, such expert may be susceptible to serious attack on cross-examination. As the Tenth Circuit astutely noted: "An opposing party can hardly challenge evidence without knowing what the evidence is." *Price*, 608 F.3d at 708. In addition, the majority's opinion sets the DHHR with astronomical costs of litigating such issues.

Even more to the point, it is inequitable that DHHR should have the burden of proof to justify allocation in the event that an injured party settles for a compromised amount *in absence* of any of the above-stated reasons. Settlements are driven by many intangible and unascertainable factors—frequently having nothing to do with the merits of the underlying litigation. DHHR should not have the burden to prove its proposed allocation in the event of an injured party who simply becomes beleaguered by or disinterested with the litigation, or a lawyer who needs to close out the case quickly for financial reasons, and settles for pennies on the dollar irrespective of the strength of his case. If an injured party settles for reasons having nothing to do with the strength of his case, doesn't he do so at the peril of his own recoupment rather than that of the DHHR and, ultimately, the taxpayers? Under the majority's scheme, DHHR would have the burden, armed with nothing but a print-out of the medical expenses paid, to prove that it is entitled to its proposed allocation amount.

### C.

### *Legislative Action*

Although the majority has established a general construct to guide the lower courts in their application of the principles in *Ahlborn*, I believe it is incumbent upon our Legislature to develop fair and efficient procedures that do not further strain the State's resources, effectively aid in facilitating fair reimbursement of taxpayer dollars, yet properly preserve the injured Medicaid recipient's settlement property. I would urge the Legislature to examine this issue further and develop a statutory scheme which ensures compliance with federal law, while giving the fullest effect to DHHR's mandatory recovery efforts.

Therefore, for the reasons stated above, I concur, in part, and dissent, in part.